# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-09-00433-CR

**Esau Alejandro Rodriguez-Flores, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
NO. D-1-DC-08-200834, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING**

### O P I N I O N

A jury convicted Esau Alejandro Rodriguez-Flores of aggravated kidnapping and assessed his punishment at twenty-nine years' imprisonment and a $5,000 fine. *See* Tex. Penal Code Ann. § 20.04 (West 2011). On appeal, Rodriguez-Flores challenges (1) the trial court's failure to allow voir dire questions about whether jurors could consider the affirmative defense of duress regardless of the age of the alleged victim, (2) the trial court's denial of his challenge for cause of a juror, (3) the trial court's admission of testimony from a pretrial services officer about an interview with Rodriguez-Flores, and (4) the legal sufficiency of the evidence supporting the jury's finding that the victim was not released in a safe place. We will affirm the judgment of conviction.

### BACKGROUND

The record shows that on the morning of February 7, 2008, Lizbeth Suarez and her two children, ten-year-old Z.J. and five-year-old A.J., were preparing to drive to school when four men

in a light-colored Volkswagen Passat stopped behind Suarez's car, blocking it from leaving the driveway.[1] Two of the men ran up to Suarez's car. One of them opened the back passenger door and grabbed A.J. by the waist. Suarez, who was in the driver's seat, grabbed A.J.'s hand and struggled to keep him in the car. Z.J. tried to help from the front passenger seat by hitting the man with her hands. When the man pulled A.J. from the car, he took him to the Passat. Suarez and Z.J. followed, screaming and trying to open the passenger doors of the Passat. Suarez ran to the front of the car to block it from leaving, but it swerved around her and sped off.

A.J., who was seven years old by the time of trial, testified that he was taken to an apartment to which he had never been. Although he was not harmed while he was there, he testified that he was scared that the men were going to hurt him. Later in the day, while it was still light outside, the kidnappers took A.J. to a house and left him with another man whom he did not know.[2] This man made soup for A.J., and he told A.J. that he would take him to his mother at 3:00 p.m., but he did not, which A.J. testified made him sad. A.J. was at this house for a long time. He watched a movie, and later, after it was dark, the man took him to another apartment building where A.J. had never been. The man told A.J. to climb up the stairs to the second floor because A.J.'s aunt's apartment was there. A.J. did not know anyone in those apartments. After the man drove off, A.J. went back down the stairs to look for help. He testified that he felt sad and scared. He never before had been out alone in a strange place at night. He was found in the dimly lit stairwell between 7:00 and 8:00 p.m. and reunited with his parents that night.

---

[1] The facts recited herein are taken from the testimony and exhibits admitted at trial.

[2] This man was never identified by the police.

2

The evidence shows that Rodriguez-Flores, who was seventeen at the time of the kidnapping, was recruited to participate in the kidnapping by his sixteen-year-old cousin, Marco Flores ("Marco"), who had been recruited by Modesto Vences Garcia ("Vences"), the live-in boyfriend of Marco's mother.[3] Vences organized the kidnapping to collect money that he believed he was owed by A.J.'s father.[4] Rodriguez-Flores and Marco testified that Vences had threatened to harm Marco's family (his mother, younger brother, girlfriend, and month-old daughter) if Marco would not do this for him. Both Rodriguez-Flores and Marco testified that they are like brothers to each other, and Rodriguez-Flores has always watched out for Marco and protected him when necessary. Marco testified that Vences is a drug dealer and a violent man, who once shot up Marco's mother's house. Both Marco and Rodriguez-Flores testified about an incident a few months before the kidnapping when Rodriguez-Flores was at Marco's mother's house, and Vences and two of his friends jumped Rodriguez-Flores and started hitting him.

Marco also testified that Vences told him he would pay him $10,000 for the kidnapping, but that he did not do it for the money, he did it to protect his baby. Rodriguez-Flores testified that Vences had mentioned the $10,000 to him, but that he also did the kidnapping to protect his family and Marco's family, not for the money. At trial, Rodriguez-Flores testified that the night before the kidnapping he told Vences he did not want to do it, and Vences hit him with a gun and pointed it in his

---

[3] To avoid confusion with Rodriguez-Flores, we will refer to Marco Flores as "Marco."

[4] A jury convicted Vences of aggravated kidnapping and assessed his punishment at fifty years' imprisonment. *Morales v. State*, No. 03-09-00474-CR, 2010 WL 3058623, at *1 (Tex. App.—Austin Aug. 3, 2010, pet. ref'd) (mem. op., not designated for publication) (affirming Vences's conviction for aggravated kidnapping).

face and told him that he had to do it because he knew too much already and Vences knew where his family lived.[5]

Rodriguez-Flores also recruited two of his friends, at Vences's request, to help with the kidnapping. He told them that Vences would pay them "good money," and he told them on the morning of the kidnapping that it would be $10,000. On the morning of the kidnapping, Vences gave Marco keys to the Passat, which Marco drove during the kidnapping. Marco acted as a lookout, while the other three got out. Rodriguez-Flores grabbed A.J., and they took him back to Marco's mother's apartment.

During the two weeks before the kidnapping, Vences drove Marco and Rodriguez-Flores to A.J.'s neighborhood several times in Marco's mother's blue Oldsmobile Alero to observe the children's routine. They once followed Z.J. and A.J. home from school, which frightened the children enough that they reported it to their parents and to the school principal, who reported it to the police and recommended that Z.J. and A.J.'s parents drop them off and pick them up each day, which they began doing. Suarez testified that sometime after this incident, she noticed a navy blue car parked in front of her house one morning when she was leaving to take the children to school. There were two men in the car watching the house. Suarez testified that the men were wearing red hooded jackets and "kind of laying back" in the car and she only saw them from a distance. She testified that the back of the car "said Balero (sic) or something like that." Although Vences, Marco, and Rodriguez-Flores parked a few houses away on their trips to observe the family routine, their suspicious behavior was noticed by

---

[5] When Rodriguez-Flores was brought in for questioning two days after the kidnapping, the police interviewed him for six hours, and he eventually signed a written statement. Despite spending six hours talking to the police about the kidnapping, he never mentioned this incident until trial.

4

other neighborhood residents, one of whom wrote down the Alero's license-plate number. After the kidnapping, these neighbors reported what they had seen to the police.

The police stopped Vences in the Alero on the day of the kidnapping and brought him in for questioning. They eventually brought in Marco, who admitted his own role in the kidnapping and also implicated Vences as the planner and Rodriguez-Flores as a participant. Rodriguez-Flores initially went voluntarily to the police station to discuss the kidnapping. Although he originally denied having knowledge of the kidnapping, after calling Marco from the police station, he admitted to participating in it. Both his interview with the police and his written statement were admitted into evidence without objection.[6] The jury saw a substantial portion of the police-interview video.

Rodriguez-Flores was charged by indictment with aggravated kidnapping. *See id.* He pled not guilty. There was a week-long jury trial, in which both the State and the defense presented evidence, and Rodriguez-Flores testified in his own defense. The trial court instructed the jury on the affirmative defense of duress. *See id.* § 8.05 (West 2011). The jury rejected that defense and found Rodriguez-Flores guilty. During the punishment phase of the trial, the jury found that Rodriguez-Flores did not release A.J. in a safe place. *See id.* § 20.04(d). The jury assessed punishment at twenty-nine years' imprisonment and a $5,000 fine. This appeal followed.

---

[6] In his police interview, Rodriguez-Flores stated that he felt like his and Marco's lives were in danger if they did not help Vences and that he felt like Marco's family was in danger, too. Rodriguez-Flores indicated in his written statement that on the night before the kidnapping, "[Marco] said he had to do it because he didn't have a ride back home, and [Vences] had threatened his baby. I agreed to help [Marco]. We felt like we didn't have a choice anymore. I felt like the family would be in danger."

**DISCUSSION**

Rodriguez-Flores raises four issues on appeal. First, he contends that the trial court erred because it did not allow certain voir dire questions about whether prospective jurors could consider the affirmative defense of duress no matter what the age of the alleged victim. Second, he argues that the trial court erred by denying his challenge for cause of a juror who indicated that she could not consider the full range of punishment and also equivocated about her view on duress and her ability to believe an accomplice witness. Third, Rodriguez-Flores challenges the trial court's admission of a pretrial services officer's testimony about her interview of Rodriguez-Flores, arguing that his substantial rights were violated, given that the trial court found that the pretrial services officer was a Travis County employee and that Rodriguez-Flores was in custody. Finally, he contends that the evidence is legally insufficient to support the jury's finding that the victim was not released in a safe place.

**Denial of voir dire questions**

In his first issue, Rodriguez-Flores contends that his trial counsel properly attempted to ask prospective jurors whether or not they could follow the law on the affirmative defense of duress regardless of the alleged victim's age. Rodriguez-Flores asserts that the trial court's denial of this proper voir dire question violated his constitutional right to be heard. *See* Tex. Const. art. I, § 10 ("In all criminal prosecutions the accused . . . . shall have the right of being heard by himself or counsel, or both . . . ."); *see also Jones v. State*, 223 S.W.3d 379, 381-82 (Tex. Crim. App. 2007) (holding denial of proper voir dire question is error of constitutional magnitude). The State responds that the trial court properly upheld its objections that Rodriguez-Flores's questions were improper commitment questions. *See Standefer v. State*, 59 S.W.3d 177, 179-83 (Tex. Crim. App. 2001).

6

Defense counsel indicated early in his voir dire that he wanted to talk to the prospective jurors about whether they would be biased against the affirmative defense of duress. He explained that to assert the affirmative defense, the defense would have to admit every element of the offense, say "we intentionally abducted a child for ransom," and then put on evidence "that the reason it was done was under a compulsion of threat of serious bodily injury or death to the actor or another person." The State objected that this was a commitment question, "asking them about a guy [who] kidnapped a kid; that's not an element of the offense -- [it's] a fact and not appropriate for this stage" of the proceedings. The trial court overruled the State's objection.

Defense counsel then questioned the panel about a number of other issues. He later returned to the issue of duress, explaining again that Rodriguez-Flores would have to admit that he committed the kidnapping to raise the defense and asking whether the panelists would be able to set aside the bias that they would obviously have against kidnappers. Defense counsel began questioning the panel by asking whether they could follow the law and find Rodriguez-Flores not guilty if the defense stipulated to the kidnapping and then put on evidence that it was more likely than not that Rodriguez-Flores was subject to a threat of imminent, serious bodily injury or death. Panelist number 2 answered that question by stating that he would have difficulty in a case where a child was the victim, prompting the State to object that the facts were being impermissibly tied to the question.[7] The trial court sustained the State's objection. Defense counsel argued that he had not brought that into the fact situation; it was the venire panelist who had said "there were certain scenarios where he would not be

---

[7] Panelist number 2 stated, "[I]n certain situations I can definitely see the duress case. However, I will say that me, personally, in a case with an adult and a child, that would be a very, very tough case for the defense to present to me."

able to follow the law." The trial court clarified the law of duress for the panelists and explained that the issue was whether they could follow the law. After further discussion with the panel about the mechanics of the law on duress and asking several panelists if they could follow the law, defense counsel included in his question the fact that Rodriguez-Flores would be admitting that he intentionally and knowingly abducted a child, and the question drew no objection.[8]

Defense counsel then returned to asking the panelists whether they would "be able to avail the defendant of the duress defense if he meets his burden" of proof, and a series of panelists agreed that they could.[9] When panelist number 25 answered that she would not be able to follow the law because the victim was a child, the State objected to asking jurors to commit based on a specific fact. Rather than ruling, the trial court said, "[n]ext question." Defense counsel responded that he believes that prospective jurors who say they could not find a defendant acted under duress under

---

[8] Defense counsel: I just have to make sure you understand exactly how the mechanics of it may work, and so there was the exact example I gave you, if he gets on the stand and says, yes, I admit every element of the offense, that I did intentionally and knowingly abduct a child, but I did so under the threat of serious bodily injury, or imminent serious bodily injury or death to myself or another person, that you would be able to find that person --

Panelist number 6: That makes sense to me.

Defense counsel: -- not guilty?

[9] Panelist number 10 indicated that she might have difficulty with the duress defense if the victim was a child, stating that "it's hard to believe that -- for a person would go, you know, the extent of kidnapping or do some kind of thing to a child." Her statement drew no objection, and defense counsel next questioned another juror about the topic of a threat or compulsion as it related to duress. He later returned to questioning the jurors about their ability to follow the law on duress if the defendant met his burden of proof.

certain facts with certain types of victims are challengeable for cause. The trial court asked defense counsel to move on to the next panelist.[10]

Defense counsel rephrased his question, asking the next panelist (number 27) whether "there are certain types of victims where you would not be able to consider the duress defense." The State objected that asking about certain types of victims was a commitment question. The trial court sustained the objection and agreed that it was an improper question. Defense counsel rephrased the question again, asking the panelist whether he would "be able to follow the law of duress and acquit regardless of the age of the victim." The panelist answered "yes," and defense counsel asked everyone on the first row whether they could "follow the law regardless of the age of the victim." The State objected "to adding the age of the victim as part of following the law," and the trial court sustained the objection. Defense counsel objected, and the trial court interrupted to state: "And overruled and preserved. Next question -- question to the others."

Defense counsel continued questioning the remainder of the panelists in sequence about their ability to follow the law on duress. As will be discussed in more detail below, two additional panelists, numbers 41 and 57, indicated that they would not be able to follow the law on duress. None of the panelists who indicated that they had a problem with the duress defense served on the jury. Defense counsel used a peremptory challenge on panelist number 2. Both sides challenged panelists 10 and 57 for cause, and the trial court granted the challenges. Defense counsel challenged

---

[10] The next panelist was panelist number 27. It appears from the record that panelist number 26 was not present for voir dire.

panelists 25 and 41 for cause, based on their answers to the duress questions, and the trial court granted those challenges.

### Standard of review for voir dire questions

The defendant in a criminal case has a constitutional right to a trial by "an impartial jury." *Sanchez v. State*, 165 S.W.3d 707, 712 (Tex. Crim. App. 2005) (quoting U.S. Const. amend. VI; Tex. Const. art. I, § 10). Thus, one purpose of the voir dire process is to determine if grounds exist for challenging any venire panelists for cause because they are biased for or prejudiced against one of the parties or the relevant law. *See id.* at 710-11. A proper voir dire question attempts to discover any preexisting bias or prejudice of the panelists, while an improper commitment question seeks to create a bias or prejudice in the panelists before they have heard the evidence. *Id.* at 712. Accordingly, questions that require a venire panelist to promise that he will base his decisions on some specific set of facts before he has heard any evidence should be allowed only when the law requires such a commitment.[11] *Id.* The reason for prohibiting improper commitment questions is to ensure that the jury will listen to the evidence with an open mind and render a verdict based upon all the evidence heard in its proper context. *Id.*

The trial court has broad discretion over the jury-selection process because "voir dire could go on forever without reasonable limits." *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim.

---

[11] Some examples of commitments that the law requires jurors to make include commitments to: consider the full range of punishment, follow the law requiring disregard of illegally obtained evidence, follow the court's instruction requiring corroboration of accomplice witness testimony, and follow the law precluding them from holding defendant's failure to testify against him. *Standefer v. State*, 59 S.W.3d 177, 181 & n.16. (Tex. Crim. App. 2001).

App. 2002). We review a trial court's restrictions on particular questions for an abuse of discretion. *Id.* at 38. A trial court abuses its discretion when it prohibits a proper question about a proper area of inquiry. *Id.*

### Standefer *analysis of commitment questions*

We determine whether a question propounded to venire panelists is a proper commitment question using a three-part inquiry. *See Standefer*, 59 S.W.3d at 179-83. We first must decide whether the propounded question is a commitment question—that is, whether it asks "a prospective juror to resolve, or to refrain from resolving, an issue a certain way after learning a particular fact." *Id.* at 179-81. Here, by asking the venire panelists whether they would be able to follow the law on duress and acquit regardless of the victim's age, defense counsel in essence asked the panelists whether they would resolve the issue of duress based upon a fact included within the question (i.e., that the victim was a child).[12] *See id.* at 179-80. Therefore, we conclude the question is a commitment question.

We next address the second part of the *Standefer* test: whether the question includes facts that lead to a valid challenge for cause.[13] *Id.* at 181-82. The State contends that Rodriguez-Flores's questions were improper because the law does not require a commitment from

---

[12] Although the final version of the question posed to the panel, whether they would "be able to follow the law of duress and acquit *regardless of the age of the victim*," arguably contains no facts, we note that the trial court had allowed the introduction of the fact that the victim was a child early in voir dire.

[13] "A challenge for cause is an objection made to a particular juror, alleging some fact which renders the juror incapable or unfit to serve on the jury." Tex. Code Crim. Proc. Ann. art. 35.16(a) (West 2006). The defense may challenge a venire panelist for cause on the grounds that "he has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely . . . as a defense to some phase of the offense for which the defendant is being prosecuted . . . ." *Id.* art. 35.16(c)(2).

11

the jury to follow the law on the issue of duress when the victim's age is considered. In other words, the State argues that the questions did not lead to a valid challenge for cause. We disagree with the State's contention.

Here, Rodriguez-Flores was entitled to rely on duress as an affirmative defense during the guilt-innocence phase of the trial. If the defendant meets his burden of proof on the affirmative defense of duress, a juror must be able to apply the defense regardless of who the victim is or any facts about the victim. *See* Tex. Penal Code Ann. § 8.05. The commitment questions posed by Rodriguez-Flores's counsel sought to discover whether any venire panelists had a disqualifying bias or prejudice against the affirmative defense of duress when a child was the victim. The court of criminal appeals has stated that a proper area of inquiry for a commitment question is whether the victim's age would create a bias against the law applicable to the case during the guilt-innocence phase of the trial.[14] *Barajas*, 93 S.W.3d at 39. When addressing whether it was appropriate for the appellant to determine whether venire panelists would consider the nine-year-old victim's age during the guilt phase of a trial for indecency with a child, the court concluded that:

> The victim's age is not a fact of consequence that tends to prove or disprove the appellant's guilt, except that, in this case, the State had to prove that the victim was

---

[14] In *Barajas*, the appellant had been indicted for indecency with a child, and the victim was nine years old at the time of the offense. *Barajas v. State*, 93 S.W.3d 36, 37 (Tex. Crim. App. 2002). The trial court had denied defense counsel's request to ask the venire panelists whether they could be fair and impartial in a case in which the victim was eight to ten years old, or alternatively, nine years old. *Id.* at 37-38. The court of criminal appeals ultimately concluded the question was improper because it was too broadly worded and thus could have been asked for both proper and improper purposes. *Id.* at 39-40. The court held that the trial court was within its discretion to require parties to phrase questions in a way precise enough to glean only relevant information from the venire panelists' answers. *Id.*

under the age of seventeen. *If a venire member stated that she would resolve the appellant's guilt on the basis of the victim's age, that venire member would be challengeable for cause.*

*Id.* at 39 (emphasis added) (citation omitted). Similarly, in this case, the victim's age is not "a fact of consequence" that tends to prove or disprove the affirmative defense of duress. Thus, it was proper for Rodriguez-Flores to challenge for cause a panelist who responded that he could not follow the law of duress and acquit regardless of the victim's age.[15] Consequently, the questions posed by Rodriguez-Flores's counsel were potentially proper commitment questions because one of the possible answers to those questions would "give rise to a valid challenge for cause." *Standefer*, 59 S.W.3d at 182; *see also* Tex. Code Crim. Proc. Ann. art. 35.16(c)(2) (West 2006).

The final step in the *Standefer* analysis is to determine whether a potentially proper question includes only those facts that lead to a valid challenge for cause.[16] 59 S.W.3d at 182-83. Inclusion of additional facts renders a question improper because the question is then an attempt to

---

[15] We again note that the trial court sustained Rodriguez-Flores's challenge for cause of panelist number 25 on the grounds that she could not follow the law on duress. Rodriguez-Flores used a peremptory challenge on panelist number 2. Both sides challenged panelist number 10, and the court granted the challenge.

[16] An example of a proper commitment question that includes only those facts necessary for a valid challenge for cause (but facts that are not contained in the indictment) is a question about whether potential jurors would automatically disbelieve a witness's testimony because of the witness's status as a convicted felon or having some criminal history. *See Vann v. State*, 216 S.W.3d 881, 886 (Tex. App.—Fort Worth 2007, no pet.); *Tijerina v. State*, 202 S.W.3d 299, 303 (Tex. App.—Fort Worth 2006, pet. ref'd); *Lydia v. State*, 117 S.W.3d 902, 905-06 (Tex. App.—Fort Worth 2003, pet. ref'd). The questions determined to be proper in *Vann, Tijerina*, and *Lydia*: (1) asked venire panelists to resolve issues of witness credibility based on particular facts about those witnesses (their status as a convicted felon or having some criminal history), (2) sought to elicit automatic bias toward a witness based on that witness's status, and (3) included only the fact of the witness's status. *See Vann*, 216 S.W.3d at 886; *Tijerina*, 202 S.W.3d at 303; *Lydia*, 117 S.W.3d at 905-06.

13

create a bias or prejudice in the panelists before they have heard the evidence, rather than an attempt to discover preexisting bias or prejudice. *See Sanchez*, 165 S.W.3d at 712. In this case, the only fact made known to the venire panel during the discussion about duress was that the victim was a child. Rodriguez-Flores's questions did not include any extraneous details about the victim, such as his exact age or his gender, or about the charged offense, such as the specific manner and means by which the kidnapping occurred.[17] *See Cardenas v. State*, 325 S.W.3d 179, 189 (Tex. Crim. App. 2010) (holding commitment question proper that limited facts included in question to statutory elements or statutory manners and means). The questions did not attempt to bind jurors to Rodriguez-Flores's version of the facts of the pending case. *See Standefer*, 59 S.W.3d at 182 (distinguishing *Atkins v. State*,

---

[17]    Although the court stated in *Cardenas* that a commitment question that includes "evidentiary facts or non-statutory manners and means remains improper under the *Standefer* test," we believe that when read in context, the court is referring to commitment questions about jurors' ability to consider the entire range of punishment for the particular statutory offense. *Cardenas v. State*, 325 S.W.3d 179, 184, 189 (Tex. Crim. App. 2010) (analyzing question about ability to consider minimum punishment for aggravated sexual assault of child); *see also Barajas*, 93 S.W.3d at 38 n.1 ("We held in *Standefer v. State*, 59 S.W.3d 177, 181 (Tex. Crim. App. 2001), that the parties may not ask whether venire members can consider probation under the particular facts of the case beyond the offense as charged in the indictment."). As the court explained in *Standefer* and has held in a number of other cases, commitment questions about jurors' ability to consider the full range of punishment that include facts outside those contained in the indictment usually will be improper because typically these questions do not lead to a challenge for cause. *See* 59 S.W.3d at 181-82; *seealso Atkins v. State*, 951 S.W.2d 787, 795 (Tex. Crim. App. 1997) (Keller, J., dissenting) (noting that almost every case in which commitment questions have been held improper has involved "an attempt to evaluate the impact of various facts on punishment deliberations"). For example, jurors may—but are not required to—give mitigating effect to particular types of evidence when considering probation, to victim impact evidence in answering the mitigation special issue in a death-penalty case, and to potential rehabilitation in answering the future dangerousness special issue. *Compare Standefer*, 59 S.W.3d at 181-82 & nn.19, 20 (citing cases in which facts included in question did not lead to challenge for cause) *with Cardenas*, 325 S.W.3d at 184 & n.22 (same).

14

951 S.W.2d 787 (Tex. Crim. App. 1997)).[18]  Therefore, it appears that Rodriguez-Flores's questions satisfy the third prong of the *Standefer* test because he sought to elicit any automatic bias that the panelists might have had against the duress defense if the victim was a child, and the only fact included in the question was the victim's status as a child.  *See Standefer*, 59 S.W.3d at 182; *Vann v. State*, 216 S.W.3d 881, 886 (Tex. App.—Fort Worth 2007, no pet.); *Tijerina v. State*, 202 S.W.3d 299, 303 (Tex. App.—Fort Worth 2006, pet. ref'd); *Lydia v. State*, 117 S.W.3d 902, 905-06 (Tex. App.—Fort Worth 2003, pet. ref'd).  We need not decide this issue, however, because even if we assume that the question was proper and the trial court erred by denying Rodriguez-Flores the right to ask it, we conclude that any error was harmless.

### Harm analysis

We conduct a harm analysis to determine whether the potential error would call for reversal of the judgment.  *See* Tex. R. App. P. 44.2; *Gonzales v. State*, 994 S.W.2d 170, 171 (Tex. Crim. App. 1999) (holding that impermissible exclusion of proper question during voir dire is subject to harm analysis).  The trial court's denial of a defendant's right to ask a proper question

---

[18]  The court explained that the commitment question in *Atkins* had been rendered improper by the inclusion of "facts *in addition* to those necessary to establish a challenge for cause." *Standefer*, 59 S.W.3d at 182.  In *Atkins*, the State sought a commitment that jurors would follow the law and convict a person of possession if the evidence showed that a person was arrested with a crack pipe in their pocket and it had a residual amount of cocaine in it.  951 S.W.2d at 789.  The court clarified in *Standefer* that it would be proper to ask venire panelists about their ability to follow the law and convict a person of possession when the possession involves only a residual amount of the drug in question (even though the fact that only a residual amount of the drug was possessed does not appear to have been a fact included in the indictment).  *See* 59 S.W.3d at 182.  It was the addition of other facts beyond those necessary to sustain a challenge for cause (i.e., arrest, possession of a crack pipe, item found in the defendant's pocket) that rendered improper what would have been a proper question.  *Id.*

15

during voir dire is an error of constitutional magnitude, violating the right to be heard found in article I, section 10 of the Texas Constitution. *E.g.*, *Jones*, 223 S.W.3d at 381-82; *see also* Tex. Const., art. I, § 10. Therefore, we must reverse the judgment unless we determine beyond a reasonable doubt that the potential error did not contribute to the conviction or punishment. *See* Tex. R. App. P. 44.2(a).

When conducting a harm analysis, we focus on the integrity of the process leading to the conviction, not on the propriety of the outcome of the trial. *See Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000). We must calculate, as nearly as possible, the probable impact of the error on the jury in light of the evidence adduced at trial. *McCarthy v. State*, 65 S.W.3d 47, 55 (Tex. Crim. App. 2001) (citing *Wesbrook*, 29 S.W.3d 119). "If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error is not harmless beyond a reasonable doubt." *Id.* The critical inquiry is whether there is "a reasonable possibility that the error, either alone or in context, moved the jury from a state of nonpersuasion to one of persuasion as to the issue in question." *Wesbrook*, 29 S.W.3d at 119.

In this case, we assume, without deciding, that the trial court erred by denying Rodriguez-Flores the opportunity to ask about the panel members' ability to apply the duress defense regardless of the victim's status as a child. We must evaluate whether there is a reasonable likelihood that the denial of this opportunity, either alone or in context, moved the jury from a state of nonpersuasion to one of persuasion that the duress defense did not apply, thus affecting Rodriguez-Flores's conviction. *See id.* at 119-20 (holding no reasonable likelihood that inadmissible portion of testimony containing additional incriminating information moved jury to state of persuasion on issue of future dangerousness when jury possessed details about defendant's "killing spree that left

16

five people dead" and his solicitation of further murders). When analyzing harm from the prohibition of a proper question that a party seeks to ask the entire venire panel, we review the entire record, and to the extent applicable, use the following factors as context for our consideration of the error's effect on the jury's deliberations: (1) any testimony or physical evidence admitted for the jury's consideration; (2) the nature of the evidence supporting the verdict; (3) the character of the alleged error and how it might be considered in connection with other evidence in the case; (4) the jury instructions; (5) the State's theory and any defensive theories; (6) closing arguments; (7) voir dire; and (8) whether the State emphasized the error.[19]  *See Rich v. State*, 160 S.W.3d 575, 577-78 (Tex. Crim. App. 2005) (citing *Motilla v. State*, 78 S.W.3d 352, 355-56 (Tex. Crim. App. 2002) (setting forth factors to consider in harm analysis and applying relevant factors to analysis of erroneous admission of evidence)).

---

[19]  In *Rich v. State*, the court of criminal appeals did not state that the harm analysis for denial of a proper jury voir dire question should be conducted under rule 44.2(b), which governs non-constitutional error, but it assumed that rule 44.2(b) applied because the court of appeals had concluded that it did and the appellant did not contest that conclusion.  160 S.W.3d 575, 577 (Tex. Crim. App. 2005).  The court later explained in *Jones v. State*, that "[a] long line of cases has held that the 'right to counsel' under the Texas Constitution includes the right to pose proper questions during voir dire examination."  223 S.W.3d 379, 381 (Tex. Crim. App. 2007).  Although the dissent in *Jones* suggested that the cases were wrongly decided, the majority stated that "the state constitutional right in question has been recognized for over ninety years" and that re-examination of whether the right was a constitutional one had not been raised by the State. *Id.* at 382.  Consequently, the court declined to re-examine the issue and clarified that the *Rich* opinion did not change prior precedent holding that denial of the opportunity to ask a proper voir dire question is an error of constitutional magnitude. *Id.*  Thus, the harm analysis is conducted under the heightened rule 44.2(a) standard of review. *Id.* at 382-83 (discussing State's attempt to limit scope of constitutional right to ask proper question).  In cases decided after *Jones*, courts have continued to apply the *Rich* factors while using the heightened rule 44.2(a) standard of review. *See, e.g.*, *id.*, *remanded to* 264 S.W.3d 26, 28 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd); *Lancaster v. State*, 319 S.W.3d 168, 171-72 (Tex. App.—Waco 2010, pet. ref'd).

We first consider the potential error's effect in the context of the remainder of the voir dire because we find that factor to be most important under the facts of this case. When we consider the entire voir dire discussion about duress, we cannot say that there is a reasonable likelihood that the trial court's potentially erroneous prohibition of the proper question materially affected the jury's deliberations. Rodriguez-Flores engaged in extensive discussion with and questioning of the venire panel about the application of the duress defense and different aspects of the defense's burden of proof to show duress. The victim's age was raised by three different panelists' responses to questions about their ability to follow the law on duress *that did not include the victim's age in the question*. None of these panelists (numbers 2, 10, and 25) served on the jury. It was only after panelist number 25 (the third panelist to raise the issue) stated that she could not consider the duress defense because the victim was a child that defense counsel attempted to question panelist number 27 and then the entire panel about their ability "to follow the law of duress and acquit regardless of the age of the victim."[20] After sustaining the State's final objection "to adding the age of the victim as part of following the law," the trial court allowed Rodriguez-Flores to continue his sequential questioning of the remaining members of the panel about their ability to follow the law on duress with the next panelist, number 28.

Defense counsel asked the remaining jurors: "If we show the threat -- that threat of imminent death or serious bodily injury, if we meet our burden and we didn't recklessly put ourselves in that position, would you be able to follow the law of duress and acquit . . . ?" Two of the remaining

---

[20] After asking panelist number 27 this question, defense counsel continued his questioning, stating: "And the same question I'll ask everybody -- I guess I'll phrase it, is everybody still the same question on row one, they could follow the law regardless of the age of the victim?" This question drew the State's final objection "to adding the age of the victim as part of following the law."

18

panelists said that they would not be able to follow the law on duress. Panelist number 41 said "no" without giving a reason, and panelist number 57 said she "could take [it] into consideration in sentencing, but I don't understand not being charged -- being -- saying you're not guilty and admitting you did the crime." The defense's challenge to number 41 was granted because of his answer to the duress question, and the challenge to number 57 was granted because both sides challenged her. As a result, every person who sat on the jury answered "yes" to the question of whether he or she could follow the law on duress after hearing that the victim was a child. In sum, given these facts, we conclude that there is no reasonable likelihood that the trial court's potentially erroneous denial of the question about the victim's age moved the jury from a state of nonpersuasion to persuasion that the duress defense should not apply to Rodriguez-Flores.

In addition, the character of the error is an important consideration. If we had concluded that denial of the proper voir dire question potentially had led to the seating of impermissibly biased jurors, that would be the sort of error that would defy analysis. *See Gonzales v. State*, 2 S.W.3d 600, 606 (Tex. App.—Texarkana 1999, pet. ref'd) (noting that this type of error can "skew every act taken by counsel in connection with the denied questions because counsel has been improperly denied the right to have any insight into the juror's reaction to that area"). Instead, we concluded that all the seated jurors had the opportunity to consider whether they could follow the law of duress after hearing that the victim was a child.[21] Thus, the trial court's potential error had no effect on the jury's

---

[21] This case also differs from those cases in which denial of a proper voir dire question makes it "almost impossible to determine how the error affected 'the way in which a defense counsel would [have] conduct[ed] the trial'" because of the nature of the question. *Tijerina*, 202 S.W.3d at 305 (alteration in original) (quoting *Gonzales v. State*, 2 S.W.3d 600, 606 (Tex. App.—Texarkana 1999, pet. ref'd) (noting that prudent defense counsel would not attempt to present evidence of a

19

consideration of the evidence admitted at trial. Consequently, the other *Rich* factors have no bearing on the harm analysis.[22]

We hold that there is not a reasonable likelihood that the trial court's potential error contributed to Rodriguez-Flores's conviction or punishment because the seated jurors all had the opportunity to consider whether they could follow the law on duress after hearing that the victim was a child. Every panelist who indicated that he or she could not follow the law on duress was struck from the panel. Given the facts of this case, we conclude that the trial court's potential error in prohibiting the proposed question about the victim's age was harmless. Therefore, we overrule Rodriguez-Flores's first issue.

**Denial of challenge for cause**

In his second issue, Rodriguez-Flores contends that the trial court erred by denying his challenge for cause to venireperson Unberhagen (panelist number 38). Rodriguez-Flores asserts that

specific defense to jury if prevented from questioning jurors about that defense)). Here, the victim's age was a fact that would be introduced at trial whether or not Rodriguez-Flores had the opportunity to ask the venire panelists about its effect on their ability to apply the duress defense. In addition, Rodriguez-Flores had the opportunity to fully explain different aspects of the duress defense and ask all the jurors about their ability to follow the law and apply it if he carried his burden of proof. In contrast, the questions asked in the cases finding harm have involved topics such as witness credibility or the applicability of a specific defense, and the courts have found that the error created harm by precluding the defendant "from making an intelligent decision" about a particular trial strategy. *E.g.*, *id.* at 305-06 (holding that denial of defendant's ability to learn whether potential jurors could impartially judge credibility of convicted felon precluded intelligent decision about exercising substantial right to testify on own behalf).

[22] We note that although "the presence of overwhelming evidence supporting the finding in question [i.e., that the duress defense does not apply] can be a factor in the evaluation of harmless error," in this case, the nature of the evidence supporting the verdict on the duress defense is sufficient, but not overwhelming, and thus a neutral factor. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000).

he challenged venireperson Unberhagen for cause based on her answers and equivocations about whether she could follow the law on the range of punishment, on duress, and on accomplice witnesses. The State responds that Rodriguez-Flores failed to preserve any alleged error for review because he did not make a timely, specific challenge for cause to venireperson Unberhagen upon which the trial court ruled adversely. Alternatively, the State contends that the trial court did not err in denying the purported challenge for cause because Unberhagen affirmatively stated that she could consider the full range of punishment.

We review the trial court's denial of a challenge for cause for abuse of discretion. *Swearingen v. State*, 101 S.W.3d 89, 98 (Tex. Crim. App. 2003). When reviewing the trial court's decision, we consider the venireperson's voir dire as a whole. *Id.* at 99. We accord great deference to the trial court's decision because the trial judge had the opportunity to observe the venireperson's demeanor and to listen to her tone of voice. *Id.*; *see also Feldman v. State*, 71 S.W.3d 738, 744 (Tex. Crim. App. 2002), *superseded by statute on other grounds*, Tex. Code Crim. Proc. Ann. art. 37.071 (West Supp. 2010), *as recognized in Coleman v. State*, No. AP-75,478, 2009 WL 4696064, at *11 & n.46 (Tex. Crim. App. Dec. 9, 2009) (per curiam) (not designated for publication). We give particular deference to the decision when the venireperson's answers are vacillating, unclear, or contradictory. *Feldman*, 71 S.W.3d at 744. The proponent of a challenge for cause bears the burden of establishing that his challenge is proper. *Id.* at 747. Rodriguez-Flores must show that Unberhagen "understood the requirement of the law and could not overcome [her] prejudice well enough to follow it." *Id.*

21

The trial court addressed both sides' challenges for cause after they had finished their voir dire of the venire panel. After a recess, the trial court informed the panel that he would have a conference with the lawyers and then would call some panelists for follow-up questions. When the trial judge conferred with counsel for both sides about their lists of challenges for cause, he informed counsel that if his notes were consistent with their challenges, then they would not need to talk to the venire panelists.[23] As the trial judge went through the list of panelists, when he reached Unberhagen (panelist number 38), he stated:

| The Court: | I show on 38 that she's not sure about probation. So we've got to bring her up. Okay. |
| Defense counsel: | Do you want to agree to that? |
| Prosecutor: | No. |

---

[23] It is clear from the context of the discussion in the record that Rodriguez-Flores challenged Unberhagen for cause and the trial court's notes reflected that she was not sure about probation. *See* Tex. R. App. P. 33.1(a)(1)(A) (requiring for preservation of error timely objection that states ground for ruling sought "with sufficient specificity to make the trial court aware of the complaint, *unless the specific grounds were apparent from the context*" (emphasis added)); *see also Feldman v. State*, 71 S.W.3d 738, 744 (Tex. Crim. App. 2002) (explaining steps for preserving error on denied challenge for cause), *superseded by statute on other grounds*, Tex. Code Crim. Proc. Ann. art. 37.071 (West Supp. 2010), *as recognized in Coleman v. State*, No. AP-75,478, 2009 WL 4696064, at *11 & n.46 (Tex. Crim. App. Dec. 9, 2009) (per curiam) (not designated for publication). As discussed in more detail below, when Unberhagen was brought up to the bench, the trial court allowed Rodriguez-Flores to question her about her answers on several topics. The State alternatively argues that if Rodriguez-Flores preserved error, he only preserved it on the issue of the challenge for cause based on Unberhagen's answer to the question of whether she could consider the full range of punishment. The State contends that error was preserved only on this issue based on a discussion that defense counsel had with the trial court after voir dire when seeking an additional peremptory strike. Defense counsel identified Unberhagen as a juror upon whom he had to use one of his peremptories when his challenge for cause was denied, but only mentioned the issue of whether Unberhagen could consider probation as grounds for his challenge for cause. The trial court denied defense counsel's request for an additional peremptory strike. We will assume, without deciding, that Rodriguez-Flores preserved error and preserved it on all the topics upon which he questioned Unberhagen at the bench.

22

Later, when preparing to call a group that included Unberhagen, the trial court stated: "I think 38 is close but we need to bring her up."[24]

When Unberhagen was brought up to the bench, defense counsel, the State, and the trial court all questioned Unberhagen extensively about her answers to various questions. When defense counsel questioned her about her ability to follow the law on certain issues, she stated that she leaned toward not considering probation, she would have a hard time applying the duress defense, and it would be harder for her to believe an accomplice witness. After the State reminded Unberhagen that aggravated kidnapping could mean a number of different scenarios and asked whether she could consider the full range of punishment from probation to life in prison, Unberhagen agreed that she could assess a sentence somewhere in that range and consider both ends of the spectrum. When defense counsel revisited the question with her, she stated "I don't think I said I could consider probation." The court and the State both reminded her that she had said she could consider the full range of punishment, and the State further discussed the issue with her as follows:

Prosecutor:     Okay. Well, the question was the full range of punishment which is from probation, five years probation all the way to life, and it's all of those fact situations including the father who's rescuing his son.

. . . .

So, what that means is that it could -- the facts could include -- remember we're not asking you what you're going to give Esau Rodriguez --

_____

[24] When defense counsel had asked Unberhagen if she could consider giving a term of probation to someone found guilty of aggravated kidnapping, she said, "I don't -- I don't think so."

23

Ms. Unberhagen:     Right.

Prosecutor:         We're asking you whether you can consider the full range of punishment for the offense of aggravated kidnapping which can mean many different things. It can mean something terrible. It can mean the example that I gave. It can mean whatever else you can come up with.

Ms. Unberhagen:     Okay.

Prosecutor:         Okay. And your answer was that you could -- and being able to consider the full range of punishment is, what that means is that you haven't already made a decision, that and you're going to wait to hear all the evidence, and after that you will set punishment somewhere in that range, that you might consider the full range of punishment and say, you know what, I think probation is appropriate, or you may consider the full range of punishment and say, you know what, I think 50 years is appropriate.

                    So, if you have already made up your mind and ruled something out, that's one thing; but if you're willing to keep an open mind and wait to make a decision once you've heard the evidence, then you're qualified.

The Court:          Request an answer.

Ms. Unberhagen:     I would rather listen to the evidence and make my decision, listen to everything.

                    . . . .

Defense counsel:    Ma'am, if you find somebody guilty of aggravated kidnapping --

Ms. Unberhagen:     Yes.

Defense counsel:    -- can you consider probation?

Ms. Unberhagen:     Yes.

24

The State also reminded Unberhagen that they had discussed the law that the jurors can evaluate witnesses and decide whether to believe all, some, or none of what a witness says, and Unberhagen agreed that although she might be more skeptical of an accomplice witness, she would "not completely" automatically disbelieve one. The State further discussed the law of duress with Unberhagen, who appears to have struggled with the defense's explanation about compulsion and the distinction between the defendant's recklessly or negligently placing himself in a situation where he would be subject to compulsion.[25] The trial court then offered additional explanation about the law of duress and questioned Unberhagen about her ability to follow the law. After its explanation, the trial court stated:

> The Court: It is possible to disagree with the particular law in this country in which we live in but still follow it, and that's really what I'm getting at. You will be told the law, and that's my job; and if I don't tell it right and I put it in writing, then it's reviewed later, and if I make a mistake, then I'm held accountable.
>
> I do not really want you to answer a question in any particular way. The reason I started asking is that I didn't know if you were one of the people who try to get off, and I'm not -- I'm certain you're not; I just want to make certain that you understand what the issues are.
>
> . . . .
>
> Whatever the law is on duress, if I give it to you, if you see it and you disagree with it, can you follow it?
>
> Ms. Unberhagen: Yes.

---

[25] The defense of duress "is unavailable if the actor intentionally, knowingly, or recklessly placed himself in a situation in which it was probable that he would be subjected to compulsion." Tex. Penal Code Ann. § 8.05 (West 2011).

25

The Court:                 Okay.

Defense counsel:     And that means finding not guilty if --

Ms. Unberhagen:     Right.

Rodriguez-Flores argues that Unberhagen should have been excused for cause, contending, without reference to any supporting authority, "that the efforts of the State and the Court to rehabilitate the juror amounted to coercion." A prospective juror is properly challengeable if he has a bias or prejudice against any phase of the law upon which the defense is entitled to rely, and

> the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law. *Before a prospective juror can be excused for cause on this basis, however, the law must be explained to him and he must be asked whether he can follow that law regardless of his personal views.*

*Id.* at 744 (citations omitted) (emphasis added). Consequently, if a prospective juror answers a question in a way that makes him challengeable for cause, the judge or the opposing party may "explain the law further in the hope of having the juror reconsider his position." *Cardenas*, 325 S.W.3d at 187.

After reviewing Unberhagen's voir dire as a whole, we conclude that her answers were, at most, vacillating, but after additional discussion with the parties and the court, ultimately clear. The trial court was in the best position to evaluate Unberhagen's responses and was entitled to believe that she could follow the law. *See Feldman*, 71 S.W.3d. at 747. Therefore, we must defer to the trial court's discretion to deny Rodriguez-Flores's challenge for cause. We overrule Rodriguez-Flores's second issue.

26

**Admission of pretrial services officer's testimony**

In his third issue, Rodriguez-Flores challenges the trial court's admission of Lana Ewing's testimony. Ewing was an officer with Travis County Pretrial Services who interviewed Rodriguez-Flores for a personal bond after Rodriguez-Flores was in custody and charged with aggravated kidnapping. Rodriguez-Flores contends that the use of Ewing's testimony at trial violated his substantial rights because the interview was a custodial interrogation by an agent of the State who did not inform him of his *Miranda* rights, given the trial court's findings that Ewing was a Travis County employee and Rodriguez-Flores was in custody when he talked to her.[26] The State argues that the record establishes that Ewing's interview with Rodriguez-Flores did not constitute a custodial interrogation because Ewing was not a law-enforcement officer and no law-enforcement agency compelled Rodriguez-Flores to speak with Ewing.

We review a trial court's ruling admitting or excluding evidence for abuse of discretion. *Ramos v. State*, 245 S.W.3d 410, 417-418 (Tex. Crim. App. 2008) (analyzing trial court's admission of statement taken after defendant arguably asserted Fifth Amendment right to remain silent). We will uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Id.* at 418.

---

[26] Rodriguez-Flores presents this issue as a violation of his substantial rights, but asserts in his reply brief that we should analyze harm under the constitutional-error rule because his "complaint is one of constitutional dimensions." We agree that because he asserts a violation of his Fifth Amendment right against self-incrimination, we would analyze any finding of error under the constitutional-error rule. *See Ramos v. State*, 245 S.W.3d 410, 419 (Tex. Crim. App. 2008) (remanding case to appellate court for harm analysis under Texas Rule of Appellate Procedure 44.2(a) after holding police did not honor appellant's assertion of his Fifth Amendment right to remain silent); *see also* Tex. R. App. P. 44.2(a).

At trial, Rodriguez-Flores challenged whether Ewing's testimony about an admission against penal interest made by Rodriguez-Flores should be admitted, arguing both that he had not received proper notice that Ewing would be a witness and that the interview was "a custodial interrogation by an agent of the State who did not inform Mr. Rodriguez of his right to remain silent nor the possibility that whatever he said might be used against him in court."[27] At a hearing outside the presence of the jury, after hearing Ewing's proposed testimony, the trial court made a finding of fact on the record that:

> [Ewing] is an employee of the County of Travis, a division . . . of the county created by the state government of the State of Texas. The defendant was in custody. Those are facts that cannot be disputed. And she did question him. The question is, is she required in her role to give any warnings. The question also is, was it interrogation. And it clearly is custodial contact. But is it custodial interrogation as that has been defined and described in law? I don't know if it is or is not. This is a new issue. . . . I have entered those findings of fact.

After argument by counsel for both sides, the trial court reserved its ruling on both this issue and the issue of whether defense counsel had received proper notice of the witness. The court indicated during discussion of the custodial-interrogation issue with counsel that "[w]e are having this discussion because I want you to know I am probably inclined to rule against you." During the discussion about reserving its ruling until the following morning, the trial court also stated that the State had established to the court's satisfaction that it had given defense counsel adequate notice of the witness. The following morning, immediately after defense counsel informed the court that he had not found any case law on point on the custodial-interrogation issue, the court granted defense counsel's

---

[27] Rodriguez-Flores does not challenge the trial court's ruling on the notice issue on appeal.

request for a running objection to the testimony, stating "The Court's ruling is the same. The objection is overruled."[28]

Ewing testified at trial about what Rodriguez-Flores told her in his interview. Rodriguez-Flores told Ewing that his cousin Marco had asked him to help kidnap a five-year-old boy because Marco could not do it alone and Vences had asked Marco to do it. Rodriguez-Flores told Ewing that Vences was fighting with someone unknown to Rodriguez-Flores over money and planned the kidnapping to get back at that person. He told her the little boy was not hurt or injured and that he last saw the child with Vences, but could not remember where. Ewing testified that she had explained to Rodriguez-Flores that the purpose of the interview was for her to make a recommendation about whether he should be released from jail on a personal bond. She stated that therefore there was some motivation for him to make himself look as good as possible when explaining to her the circumstances of his offense. Ewing testified that Rodriguez-Flores did not tell her that he had been forced, threatened, or coerced into committing the kidnapping or that his own life or his family's life had been threatened or that he feared for his own or their safety.

---

[28] The State argues that there was no adverse ruling (or any ruling at all) on the custodial-interrogation issue, and therefore, Rodriguez-Flores did not preserve error on this issue. The State, citing *Heidelberg v. State*, also complains that Rodriguez-Flores's argument on appeal does not correspond with his objections at trial because on appeal Rodriguez-Flores does not mention "custodial interrogation" and he uses different arguments and analogies than he presented to the trial court. 144 S.W.3d 535, 537-38 (Tex. Crim. App. 2004) (analyzing preservation of error when defendant asserted federal, but not state, constitutional error at trial and asserted state constitutional error on appeal). We note that Rodriguez-Flores bases his appellate argument on the constitutional concerns raised by a county employee's interview of him while in custody without warning him and then having those statements used against him at trial. We will assume without deciding that Rodriguez-Flores adequately preserved error and that his issue presented for review is the same as his objection at trial.

Rodriguez-Flores argues that a defendant cannot be forced to forfeit his constitutional right against self-incrimination to assert his constitutional right to bail. *See Simmons v. United States*, 390 U.S. 377, 393-94 (1968) (holding that defendant's testimony offered in support of motion to suppress evidence may not later be admitted against him at trial on issue of guilt because one constitutional right should not have to be surrendered in order to assert another); *see also Lykins v. State*, 784 S.W.2d 32, 36-37 (Tex. Crim. App. 1989) (holding that defendant need not invoke his privilege against self-incrimination and did not waive privilege by answering corrections officer's questions because corrections department imposed direct penalty for failure to answer corrections officer's questions). The Fifth Amendment right against self-incrimination protects an individual from being compelled by the state to be a witness against himself. U.S. Const. amend. V. The Supreme Court has established procedural safeguards to secure an individual's privilege against self-incrimination during custodial interrogation and has held that the prosecution may not use statements stemming from custodial interrogation of the defendant unless it demonstrates the effective use of those procedural safeguards. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The State contends that the right against self-incrimination is not implicated here because Rodriguez-Flores's statements to Ewing were not the product of custodial interrogation.

Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* A custodial interrogation occurs, and the *Miranda* safeguards must be used, when a defendant is in custody and is exposed "to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*,

30

446 U.S. 291, 301 (1980). The court of criminal appeals has established that *Miranda* generally only applies to questioning by law-enforcement officers or their agents. *Wilkerson v. State*, 173 S.W.3d 521, 527 (Tex. Crim. App. 2005) (holding trial court did not abuse its discretion when it implicitly concluded child protective services investigator was not acting as law-enforcement agent for *Miranda* purposes and admitted investigator's testimony about defendant's statement to her). The State argues that Ewing's interview was not a custodial interrogation because the record affirmatively established that Ewing was not a law-enforcement officer and that no law-enforcement agency compelled Rodriguez-Flores to speak with Ewing.

The trial court found that Ewing was a county employee who questioned Rodriguez-Flores while he was in custody. Although "all those who are employed by any state agency are, by definition, 'state agents,' . . . only those who are working for or on behalf of police are law-enforcement 'state agents.'" *Id.* at 528. Different types of state employees serve different roles, and law enforcement's role is "to ferret out crime, investigate its commission, arrest the perpetrator, and gather evidence for a possible prosecution." *Id.* Ewing testified that the purpose of the pretrial services interview is to "interview individuals that are looking to get out of jail on their own recognizance without having to put forth any money as long as they are able to come back to court and comply with any stipulations that are set," not for any law-enforcement purposes. She gathers information from defendants who independently choose whether they want to be interviewed for a personal bond so that she can make a recommendation to the judge about whether they should be approved for a personal bond. The information she gathers includes the defendant's address, phone number, employment

31

information, references, "anything that they want to say about the allegations that happened, [and] how they got brought to jail."

We must examine the entire record to determine whether a particular state agent is working for or on behalf of the police in a particular case. *Id.* at 529-30. We must evaluate the actions and perceptions of the parties involved: the police, Ewing, and Rodriguez-Flores. *See id.* at 530. We first consider the relationship between the police and Ewing. *See id.* Ewing testified that no one from the Austin Police Department, the district attorney's office, or any law-enforcement agency had asked her to speak with Rodriguez-Flores about the offense. It appears from the record that there was no relationship between Ewing and the police: the police did not arrange the meeting, they were not present during the interview, they did not provide Ewing with questions to ask or give her instructions to obtain certain information from Rodriguez-Flores, and there was no "'calculated practice' between the police and [Ewing] that was likely to evoke an incriminating response from [Rodriguez-Flores] during the interview." *Id.* Nothing in the record shows that the police were using Ewing's interview to obtain information that they could not lawfully obtain themselves. *See id.*

Next, we review the record of Ewing's actions and perceptions about the purpose of the interview. *See id.* As described above, Ewing's primary reason for questioning Rodriguez-Flores was to determine whether she should recommend that he be granted a personal bond, and her questions were aimed at gathering information for that purpose, not to assist with his criminal prosecution. *See id.* She interviewed Rodriguez-Flores at his request after she asked him if he would like to be interviewed for a personal bond. *See id.* Ewing testified that her five-to-ten minute interview with Rodriguez-Flores was a routine part of her job and that she regularly conducts similar interviews with people who are

32

arrested for various offenses. She testified that this was the first time that she has ever been asked to testify in court about something a defendant told her. She testified to the jury that she is not a police officer or a peace officer; she testified in the hearing outside the presence of the jury that she is not a law-enforcement officer. Nothing in the record indicates that Ewing believed that she was acting as a law-enforcement agent. *See id.*

Finally, we examine the record for Rodriguez-Flores's perceptions of the encounter. *See id.* Rodriguez-Flores did not testify about Ewing's interview of him, so we have no direct evidence about whether he believed he was talking to "a law-enforcement agent, someone cloaked with the actual or apparent authority of the police." *Id.* Accordingly, we must evaluate the likely belief of a reasonable person in Rodriguez-Flores's position. *See id.* at 531. Ewing testified that when she interviews defendants for a personal bond, she calls them up and identifies herself as being with pretrial services and asks if they understand what a personal bond is. If they do not, she explains it to them and asks if they would like to apply for it. It is not mandatory that a defendant interview with pretrial services; the defendant must choose whether to do it. Based on these facts, we cannot conclude that a reasonable person in Rodriguez-Flores's position would have believed Ewing was a law-enforcement agent. *See id.* at 533.

On the other hand, Ewing testified that the information she gathers from defendants, which includes information about the offense for which they have been arrested, provides the basis for her recommendation to the judge about whether they should be granted a personal bond or not. The usual purpose of the interview is to enable the court to determine whether a defendant should be allowed out on a personal bond. While under ordinary circumstances Ewing would not be considered

33

to be acting as a law-enforcement agent for *Miranda* purposes when she interviewed Rodriguez-Flores, and the interview she conducted would not be a custodial interrogation requiring *Miranda* warnings, the State's attempt to rely on the unwarned statements that Rodriguez-Flores made to Ewing raises Fifth Amendment concerns similar to those addressed by the United States Supreme Court in *Estelle v. Smith*, 451 U.S. 454 (1981). In *Estelle*, a court-appointed psychiatrist had interviewed the defendant in jail to determine his competency to stand trial, and the State later used the defendant's unwarned statements against him during the penalty phase of a capital murder trial to prove future dangerousness. *Id.* at 457-60. The Supreme Court held that the admission of the psychiatrist's testimony at the penalty phase violated the defendant's Fifth Amendment rights. *Id.* at 466-68. The Court explained that "[w]hen [the psychiatrist] went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of [defendant's] future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting." *Id.* at 467. "In essence, an agent of the trial judge, himself a state agent, was used to collect incriminating evidence for the prosecution." *Wilkerson*, 173 S.W.3d at 527 n.17 (discussing *Estelle*). We conclude that the State's use of Ewing's testimony at trial had the same effect, changing her role from reporting to the court on the issue of Rodriguez-Flores's suitability for personal bond to that of a state agent used to collect incriminating evidence for the prosecution.[29]

---

[29] Although the situation in this case differs from *Estelle* because Rodriguez-Flores was not compelled to talk to Ewing, the interview is nevertheless a practice that is reasonably likely to evoke an incriminating response from a suspect, as "incriminating response" has been defined by the Supreme Court. *See Rhode Island v. Innis*, 446 U.S. 291, 301-02 & n.5 (1980). An "incriminating response" is "any response—whether inculpatory or exculpatory—that the *prosecution* may seek to

Accordingly, after considering the whole record, we will assume without deciding that the trial court abused its discretion by admitting Ewing's testimony about Rodriguez-Flores's statements in his interview. But even assuming error by the trial court, we find it to be harmless error. Our review of the entire record indicates that there is no reasonable possibility that admitting this testimony moved the jury from a state of nonpersuasion to one of persuasion that Rodriguez-Flores was not entitled to the duress defense. *See Wesbrook*, 29 S.W.3d at 119. The jury heard testimony from Rodriguez-Flores and Marco about their fear that Vences would harm them and Marco's family if they did not help him with the kidnapping, and they saw most of Rodriguez-Flores's six-hour police interview. The State obtained an admission from Rodriguez-Flores that he had never mentioned to police that Vences threatened him with a gun the night before the kidnapping. Although Ewing testified that Rodriguez-Flores did not mention being threatened or fearing for his life in her interview with him, she also acknowledged that the interview lasted approximately "five or ten minutes" and that she does not usually get too much into the details with the inmates. Neither side mentioned the interview in its closing argument. Given the substantial amount of other testimony about the details of the threats from Vences, there is no reasonable likelihood that the jury was moved to a state of persuasion that

introduce at trial." *Id.* at 301 n.5. The Supreme Court held in *Innis* that "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent," and that "its functional equivalent" refers to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 300-01. As discussed above, a pretrial services officer's report to the court for the limited purpose of determining a defendant's suitability for personal bond ordinarily would not raise Fifth Amendment concerns because the pretrial services officer's role is not normally that of a law-enforcement agent. It is the prosecution's decision in this case to subpoena Ewing and introduce her testimony that transformed her into a state agent used to collect incriminating information and the interview into a custodial interrogation.

Rodriguez-Flores did not act under duress based on Ewing's interview, considered either alone or in context. *See id.* at 120; *see also Clay v. State*, 240 S.W.3d 895, 904-05 (Tex. Crim. App. 2007) (analyzing harm from evidence admitted in violation of constitutional right). Thus, any error from the admission of Ewing's testimony would be harmless. We overrule Rodriguez-Flores's third issue.

**Legal sufficiency of evidence**

In his fourth issue, Rodriguez-Flores contends that the evidence supporting the jury's failure to find release of the victim in a safe place was legally insufficient. *See* Tex. Penal Code Ann. § 20.04(d). If a defendant proves by a preponderance of the evidence that he voluntarily released the victim in a safe place, aggravated kidnapping is reduced from a first-degree to a second-degree felony at the punishment stage. *Id.* After the trial court submitted this question to the jury, it found that Rodriguez-Flores did not release A.J. in a safe place. The State argues that there was substantial evidence in the record supporting the jury's finding.

Although the court of criminal appeals has not directly addressed the issue, most courts of appeals allow defendants to challenge the legal sufficiency of the evidence supporting a jury's rejection of an issue for which the defendant bore the burden of proof.[30] *See, e.g.*, *Ballard v. State*, 161 S.W.3d 269, 271-72 (Tex. App.—Texarkana 2005) (collecting cases), *aff'd*, 193 S.W.3d 916 (Tex. Crim. App. 2006); *Howard v. State*, 145 S.W.3d 327, 330-32 (Tex. App.—Fort Worth 2004, no pet.); *but see Naasz v. State*, 974 S.W.2d 418, 421 (Tex. App.—Dallas 1998, pet. ref'd) (holding courts of appeals have no jurisdiction to review legal sufficiency of evidence supporting jury's rejection of issue for which defendant bore burden of proof). When conducting such a legal-sufficiency

---

[30] *See also Morales*, 2010 WL 3058623, at *1 n.2 (noting same in Vences's appeal).

review, an appellate court reviews the evidence in a light most favorable to the verdict and reverses only when the evidence conclusively establishes the opposite. *Perez v. State*, 323 S.W.3d 298, 304 (Tex. App.—Amarillo 2010, pet. ref'd); *Wheat v. State*, 165 S.W.3d 802, 807 n.6 (Tex. App.—Texarkana 2005, pet. ref'd, untimely filed) (citing *Ballard*, 161 S.W.3d 269); *Howard*, 145 S.W.3d at 334. In this situation, we apply a two-part test. *See Clark v. State*, 190 S.W.3d 59, 62 (Tex. App.—Amarillo 2005, no pet.); *Ballard*, 161 S.W.3d at 272; *Nolan v. State*, 102 S.W.3d 231, 238 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd); *Howard*, 145 S.W.3d at 334. First, we examine the record for evidence that supports the negative finding on the defendant's issue, while ignoring evidence to the contrary. *Howard*, 145 S.W.3d at 334. If the evidence supports the jury's rejection of the issue, our analysis ends here. If, however, there is no evidence to support the finding, we examine the entire record to determine whether the evidence establishes the defendant's affirmative defense or issue as a matter of law. *Id.*

The parties do not dispute that A.J. was voluntarily released; the only issue is whether he was released in a safe place. The factors we consider when making this determination include: the remoteness of the location, the proximity of persons who could aid or assist the victim, the time of day, the climatic conditions, the victim's condition, the character of the location or surrounding neighborhood, and the victim's familiarity with the location or neighborhood. *Nolan*, 102 S.W.3d at 238.

Ciriolo Mora testified that he found A.J. in a stairwell in his apartment complex between 7:00 and 8:00 p.m. on the night of February 7, 2008. He asked A.J. if he could help him, and after A.J. told him what had happened to him, Mora called the police. Mora had a child the same age as A.J., and he testified that he was concerned about A.J. because he was a small child who could not really help

himself and because of the weather. Although Mora testified that "[i]t was a little cool" that night, he also testified that his wife suggested that they get a blanket to put around A.J. Mora testified on cross-examination that there are a lot of families with young children in the apartment complex and that the children play outside in the courtyard there during the daytime. But he does not let his own children play there without supervision, and he testified to his opinion that "there is no such thing as a safe place anywhere for a five-year-old child on his own."

Sergeant Kurt Thomas, one of the police officers assigned to the kidnapping investigation, immediately went to the apartment complex where A.J. had been found after the police officer who responded to the 911 call confirmed A.J.'s name. He met with Mora and inspected the scene where A.J. was found. He described the stairwell as "very dark" and testified that it was not a safe place for a five-year-old child to be alone after dark. Although the man who released A.J. had told A.J. that his aunt lived in one of the apartments, the police canvassed the entire building to identify the residents, and they did not find that any relatives of A.J. lived there.

Rodriguez-Flores emphasizes that A.J. was found quickly in a well-occupied multi-family apartment complex and needed no medical treatment. He also points out that although A.J. was left alone in the stairwell after dark, it was early evening and the stairwell led to occupied apartments. But we must review the evidence in the light most favorable to the verdict, considering only supporting evidence and ignoring evidence contrary to the verdict. *See Clark*, 190 S.W.3d at 62-63 (finding evidence legally sufficient to support jury's rejection of safe release). The State presented evidence that a five-year-old boy was left alone in a dark stairwell of an unfamiliar apartment complex on a cold February night. As this Court stated in Vences's appeal, which involved the same material facts concerning A.J.'s safe release, "A.J.'s good fortune in being found by Mora and safely returned

38

to his family does not mean that the apartment complex was a safe place for the boy under the circumstances." *Morales v. State*, No. 03-09-00474-CR, 2010 WL 3058623, at *2 (Tex. App.—Austin Aug. 3, 2010, pet. ref'd) (mem. op., not designated for publication) (affirming Vences's conviction for aggravated kidnapping). Our review of the evidence presented in this case shows that it supports the jury's verdict and does not conclusively establish the opposite.[31] We overrule Rodriguez-Flores's fourth issue.

## CONCLUSION

Having overruled all of Rodriguez-Flores's issues on appeal, we affirm the judgment of conviction.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Henson and Goodwin

Affirmed

Filed: October 28, 2011

Publish

---

[31] Although we are not bound by "the law of the case" doctrine here because this is not a subsequent proceeding in the same case involving the same parties, *see Jordan v. State*, 576 S.W.2d 825, 828 (Tex. Crim. App. 1978), we note that the Court in *Morales* stated that the evidence was legally sufficient to support the jury's adverse finding on the release issue, although Vences had not challenged the finding on legal-sufficiency grounds. *Morales*, 2010 WL 3058623, at *2 n.3. While not binding upon us, the conclusion reached in *Morales* is certainly persuasive. *See Jordan*, 576 S.W.2d at 828.