

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00056-CR
_____

JACOB DOUGLAS ELLISON, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 355th District Court
Hood County, Texas
Trial Court No. CR13588

Before Sudderth, C.J.; Birdwell and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

Appellant Jacob Douglas Ellison appeals his conviction for aggravated sexual assault. In his first issue, he contends that the trial court wrongly refused a question during voir dire. Controlling precedent shows that the refusal was proper. In his second issue, Ellison argues that he received ineffective assistance when counsel advised him to plead guilty. A lack of record support for his allegations requires us to conclude otherwise. In a third issue, Ellison complains of the State's closing argument. This complaint is not preserved for our review. We therefore affirm.

## I. BACKGROUND

In 2016, Diane Isim[1] lived on the outskirts of town in a trailer with her four children and Ellison, who was the father of two of her children. Diane's daughter Nora had a different father. One morning in June 2016, Nora told her mother that Ellison had molested her. An investigation began, and on October 12, 2016, Ellison was indicted on multiple counts. Count three charged him with aggravated sexual assault of a child younger than fourteen. *See* Tex. Penal Code Ann. § 22.021(a)(1)(B)(i), (a)(2)(B). Ellison pleaded guilty to count three as charged, and the State moved to dismiss the remaining counts. Ellison elected to have punishment tried to a jury.

---

[1]We use pseudonyms to protect the complainant's identity. *See Daggett v. State*, 187 S.W.3d 444, 446 n.3 (Tex. Crim. App. 2005).

At the trial on punishment, Diane testified about the morning when Nora told her, "Daddy Jacob does bad things to me." According to Diane, Nora described how Ellison would remove her underwear and assault her. Diane took Nora to Cook Children's Medical Center. Nurse Christi Thornhill testified that during an interview at the hospital, Nora explained that Ellison had come into her room and put his genitals or his fingers into her "[m]ore than one time, maybe six" times. By Thornhill's account, Nora reported that the abuse began when she was five; she was six at the time of the interview. Nora also testified concerning the abuse, confirming many of these details. Investigator Robert Young of the district attorney's office testified that he took Diane's report and, later, interviewed Ellison. According to Young, Ellison admitted being aroused around Nora, explained that he felt disgusted with himself, and said he believed Nora's story.

During the defense's case, the jury heard from Ellison's employer, who testified that he had been a model employee, was forthcoming about the charges against him, and was sorry for what he had done. Ellison's brother Andrew testified that he did not observe anything out of the ordinary when he stayed with Ellison and Diane; there were no signs that Nora was afraid of Ellison. Ellison also presented evidence that because he had pleaded guilty, he would be subject to stringent sex offender registration requirements for the rest of his life.

After the conclusion of the evidence, the trial court assessed punishment at the statutory maximum—ninety-nine years' confinement and a $10,000 fine. *See id.* § 12.32. Ellison appeals.

## II. LIMITATION ON VOIR DIRE

In his first issue, Ellison challenges the trial court's refusal of a question during voir dire. Ellison requested permission to ask the venire members whether they could be impartial and consider the evidence before making a decision if the victim was under the age of ten. The trial court denied Ellison's request but gave him latitude to ask a slightly different question: whether they could remain "fair and impartial" when "this charge is an aggravated sexual assault of a child who's under the age of 14."

On appeal, Ellison complains that the trial court improperly restricted voir dire. He asserts that his proffered question would have better shed light on any bias against those charged with sex crimes against young children, which he maintains is a proper subject of inquiry.

Ellison acknowledges that the court of criminal appeals rejected a substantially similar question in *Barajas v. State*, 93 S.W.3d 36 (Tex. Crim. App. 2002). There, defense counsel desired to ask whether the venire members could be impartial in an indecency case involving a victim who was eight to ten years old or, in the alternative, a victim who was nine years old. *Id.* at 38. The appellate court laid out the standards for judging the limitation of voir dire questioning as follows:

4

The trial court has broad discretion over the process of selecting a jury. The main reason for this is that voir dire could go on forever without reasonable limits. We leave to the trial court's discretion the propriety of a particular question[,] and the trial court's discretion will not be disturbed absent an abuse of discretion. A trial court's discretion is abused only when a proper question about a proper area of inquiry is prohibited.

A question is proper if it seeks to discover a juror's views on an issue applicable to the case. An otherwise proper question is impermissible, however, if it attempts to commit the juror to a particular verdict based on particular facts. In addition, a voir dire question that is so vague or broad in nature as to constitute a global fishing expedition is not proper and may be prevented by the trial judge.

*Id.* at 38–39 (citations omitted). The *Barajas* court held that the defendant's proposed question concerning the victim's age was, at once, both an improper commitment question and so vague that it would lead to an inappropriate fishing expedition. *Id.* at 39–40.

Ellison says that *Barajas* is distinguishable. That is true, perhaps, but not in any way that benefits Ellison.

First, Ellison points out that the defendant in *Barajas* advanced a more specific age range for the hypothetical victim: in *Barajas*, between ages eight and ten; here, under age ten. But if the question in *Barajas* was too broad and vague, we fail to see how offering an only somewhat looser description of the victim's maturity works to Ellison's advantage. *See Green v. State*, 191 S.W.3d 888, 892 (Tex. App.—Houston [14th Dist.]

5

2006, pet. ref'd) (holding that the case was controlled by *Barajas* when defendant proposed a slightly vaguer description of the victim's age range).[2]

Second, Ellison observes that in *Barajas*, the defendant went to the jury for a determination of guilt as well as punishment, whereas Ellison had a jury trial only for punishment. 93 S.W.3d at 38. Ellison does not explain the significance of this distinction, and *Barajas* shows that there is none. According to the *Barajas* court, the complainant's age might be relevant to three aspects of the trial: the guilt phase, the determination of the victim's credibility as a witness, and the assessment of punishment. *Id.* at 39. But the court held that as it was phrased, the proposed question was fatally flawed with regard to all three aspects. *Id.* at 39–40. Here, because no trial was had on guilt, the victim's age could be relevant to only two of the three aspects mentioned in *Barajas*—credibility and punishment—but the same flaws persist.

According to the *Barajas* court, one of these flaws was the framework in which the inquiry was housed. "The question 'can you be fair and impartial under a given set of facts?' can be repeated to include every fact in a given case." *Id.* at 41. "This 'fair and impartial' question is a license to go fishing, without providing any concrete information for the intelligent use of peremptory or for-cause challenges." *Id.* This

---

[2]As we explain below, the trial court's proposed age range—under the age of fourteen—better complied with the rules governing commitment questions.

broad question framework, the court said, was liable to lead to "fishing expeditions during voir dire that may extend jury selection *ad infinitum.*" *Id.* at 42.

Which brings us to a third distinction, the format of the proposed question. In *Barajas*, the defendant proposed to ask if the venire members "could be fair and impartial" given the victim's age. Here, Ellison's proposed age inquiry differed in its phrasing: would the victim's age "affect their ability to . . . remain impartial and consider the evidence before making a decision?" Despite the minor difference between these premises, the two are equally broad and indefinite. Thus, Ellison's proposed inquiry was contained in a fishing boat of a slightly different build, but a fishing boat nonetheless according to the logic of the *Barajas* majority.[3] Ellison's proposed inquiry could have been, but was not required to be, disallowed on this basis alone, and exclusion of Ellison's proposed question would not exceed the court's "broad discretion" over how voir dire should be conducted. *See id.* at 39 (providing that a vague question "may" be excluded). And Ellison does not complain on appeal that the trial court improperly *allowed* an alternative question in a similar format. *See id.* at 39 (explaining that a court abuses its discretion only when "a proper question about a

---

[3]Ellison also argues that *Barajas* was wrongly decided, citing the well-considered dissent in that case. *Barajas v. State*, 93 S.W.3d 36, 45 (Tex. Crim. App. 2002) (Meyers, J., dissenting). But the soundness of *Barajas* is not a question for this court. *See Sell v. State*, 488 S.W.3d 397, 399 (Tex. App.—Fort Worth 2016, pet. ref'd); *Lydia v. State*, 117 S.W.3d 902, 913 (Tex. App.—Fort Worth 2003, pet. ref'd) (Dauphinot, J., concurring) (acknowledging our duty to follow *Barajas*, but respectfully encouraging the court of criminal appeals to reconsider that opinion).

proper area of inquiry is *prohibited*" (emphasis added)). Usually we may not reverse a trial court's ruling on a basis not raised by the appellant. *Martinez v. State*, 91 S.W.3d 331, 336 (Tex. Crim. App. 2002).

As previously mentioned, the *Barajas* court found another flaw in the proposed inquiry: it was an improper commitment question. Commitment questions are those that commit a prospective juror to resolve, or to refrain from resolving, an issue a certain way after learning a particular fact. *Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001). For a commitment question to be proper, one of the possible answers to that question must give rise to a valid challenge for cause. *Id.* at 182. "If a venire member stated that she would resolve the appellant's guilt on the basis of the victim's age, that venire member would be challengeable for cause." *Barajas*, 93 S.W.3d at 39. But a commitment question may also be improper if it introduces "facts beyond those necessary to establish a challenge for cause." *Lydia v. State*, 109 S.W.3d 495, 498 (Tex. Crim. App. 2003). For example, the State may properly ask a general commitment question as to whether the venire members could follow a law that holds a person guilty of possession even though the possession involves only a residue amount of drugs, because such a question would include only that quantum of factual content necessary to frame a proper commitment. *Standefer*, 59 S.W.3d at 182. But it would cross the line if the State supplied additional facts within its question, such as that the defendant was arrested and found with a crack pipe in his pocket. *Id.*

8

Ellison contends that his proposed question was a proper commitment question about a proper subject of inquiry and that the trial court therefore abused its discretion by disallowing it. However, Ellison's question would have supplied the jury with an additional, case-specific fact—a more specific age-range for the victim—beyond what was necessary to frame any commitment. The trial court therefore did not abuse its discretion in rejecting it. *See id.*

This suggests a fourth point of distinction. In *Barajas*, the trial court excluded any questions relating to the victim's age whatsoever. 93 S.W.3d at 42. Here, the trial court denied Ellison's proposed question, but the court allowed a compromise solution, permitting Ellison to ask about a victim under age fourteen. While the trial court chose a different path than that discussed in *Barajas*, the court nonetheless adhered to that case's directive not to introduce any additional facts beyond what was necessary to frame the commitment. The factual content of the question was restricted to the basic elements of the offense as set out in the statute.[4] *See Standefer*, 59 S.W.3d at 181 (approving of a commitment question when it exposed the venire members to no additional facts beyond the necessary "factual elements . . . listed in the statute"); *Lee v. State*, 176 S.W.3d 452, 461 (Tex. App.—Houston [1st Dist.] 2004) (approving of a commitment question because it described the victim's age only as "under the age of

---

[4]A person commits the offense of aggravated sexual assault if the person causes the penetration of the sexual organ of a child younger than fourteen years of age by any means. Tex. Penal Code Ann. § 22.021(a)(1)(B)(i), (a)(2)(B).

seventeen," as set out in the statutory elements, without disclosing the victim's specific age), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006); *see also Rodriguez-Flores v. State*, 351 S.W.3d 612, 622–23 (Tex. App.—Austin 2011, pet. ref'd) (similar).

By limiting Ellison's question to a factual basis that tracked the statute, the trial court (1) allowed Ellison to probe for prejudice regarding age but (2) shielded the venire members from premature exposure to the facts of the case and, in doing so, (3) limited the risk of an improper commitment question. *See Jacobs v. State*, 560 S.W.3d 205, 207, 213 (Tex. Crim. App. 2018) (approving the trial court's middle-path solution—rejecting the defendant's proposed question about bias against a defendant previously convicted of a "sexual offense" but allowing a more general question concerning prior "assaultive offenses"—because it allowed defendant the opportunity to ferret out bias but avoided the risk that a more specific question would expose the venire to the facts of the case). Despite this distinction, then, the trial court remained within its rights under *Barajas*.

None of these four distinctions serve Ellison's purpose, and after considering them all, we remain convinced that *Barajas* is squarely on point. We therefore follow that case's command and overrule Ellison's first issue.

## III. VOLUNTARINESS OF PLEA

In his second issue, Ellison contends that he received ineffective assistance of counsel. He asserts that the trial court erred by denying his motion for new trial on that account.

A claim of ineffective assistance of counsel may be raised in a motion for new trial. *Smith v. State*, 286 S.W.3d 333, 340 (Tex. Crim. App. 2009). We review a trial court's denial of a motion for new trial on the basis of ineffective assistance under an abuse of discretion standard. *Burch v. State*, 541 S.W.3d 816, 820 (Tex. Crim. App. 2017). This is a deferential standard of review that requires appellate courts to view the evidence in the light most favorable to the trial court's ruling. *Id.* We do not substitute our own judgment for that of the trial court, and we must uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Id.*

A defendant is entitled to effective assistance of counsel in the guilty-plea context. *Ex parte Evans*, 537 S.W.3d 109, 111 (Tex. Crim. App. 2017). To establish ineffective assistance, an appellant must prove by a preponderance of the evidence that his counsel's representation was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013); *Hernandez v. State*, 988 S.W.2d 770, 770 (Tex. Crim. App. 1999). The record must affirmatively demonstrate that the claim has merit. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

In evaluating counsel's effectiveness under the deficient-performance prong, we review the totality of the representation and the particular circumstances of the case to determine whether counsel provided reasonable assistance under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava*, 415 S.W.3d at 307; *Thompson*, 9 S.W.3d at

11

813–14. Our review of counsel's representation is highly deferential, and we indulge a strong presumption that counsel's conduct was not deficient. *Nava*, 415 S.W.3d at 307–08.

An appellate court may not infer ineffective assistance simply from an unclear record or a record that does not show why counsel failed to do something. *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012); *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007). Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Menefield*, 363 S.W.3d at 593. If trial counsel did not have that opportunity, we should not conclude that counsel performed deficiently unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Nava*, 415 S.W.3d at 308. Direct appeal is usually inadequate for raising an ineffective-assistance-of-counsel claim because the record generally does not show counsel's reasons for any alleged deficient performance. *See Menefield*, 363 S.W.3d at 592–93; *Thompson*, 9 S.W.3d at 813–14.

*Strickland*'s prejudice prong requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial—that is, a trial with a reliable result. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. In other words, an appellant must show a reasonable probability that the proceeding would have turned out differently without the deficient performance. *Id.* at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. In the guilty-plea context, the focus of the prejudice inquiry is on whether a defendant has shown that but for counsel's errors, there is a reasonable probability that

12

he would not have pleaded guilty and would have insisted on going to trial. *Ex parte Torres*, 483 S.W.3d 35, 43 (Tex. Crim. App. 2016) (citing *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985)).

As we read his brief, Ellison offers three theories as to how his trial counsel was deficient under the first prong of *Strickland*. First, Ellison says he was "unaware the juries in Hood County routinely give out 99-year sentences on guilty pleas for aggravated sexual assault, and . . . he should have been told this information by his trial counsel."

However, the record contains no proof that sentences of this kind were routine. To defeat the presumption of reasonably effective assistance, any allegation of ineffectiveness must be firmly founded in the record. *Prine v. State*, 537 S.W.3d 113, 117 (Tex. Crim. App. 2017). Ellison introduced no evidence of sentencing patterns in the locality, let alone evidence by offense type and plea status. As such, the presumption of effective assistance remains intact. *See id.*

Second, Ellison asserts that trial counsel was ineffective in that he made an improper and coercive promise under *Brady v. United States*, 397 U.S. 742, 753, 90 S. Ct. 1463, 1471 (1970). According to Ellison's testimony at the hearing on his motion, counsel advised him that pleading guilty was "probably the only way that [he was] ever seeing the light of day again." Ellison contends this advice runs afoul of *Brady*'s pronouncement that to be admissible, "a confession must be free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct

13

or implied promises, however slight, nor by the exertion of any improper influence." *Id.*, 90 S. Ct. at 1471 (quotations omitted). By Ellison's reasoning, trial counsel's dire prediction was an improper and coercive promise, and because he pleaded guilty based on this promise, his plea was involuntary under *Brady*.

Ellison's reliance on *Brady* is misplaced. He refers to a portion of *Brady* that concerns the constitutional dangers that arise when "*agents of the State . . .* produce a plea by actual or threatened physical harm or by mental coercion overbearing the will of the defendant." *Id.* at 750, 90 S. Ct. at 1470 (emphasis added). More specifically, it discusses ill-gotten "promises" by the "prosecutor[]." *Id.* at 755, 90 S. Ct. at 1472. Ellison cannot contend that his trial counsel was a state actor.[5]

Rather than casting defense counsel as a villain, *Brady* speaks of counsel as a guardian of Fifth Amendment freedoms, saying that the harmful effects of coercive

---

[5]Ellison has not directed our attention to any other forms of coercive state action that might render his plea involuntary. To the contrary, the record shows that state actors took steps to ensure that Ellison's plea was knowing and voluntary. Before accepting his guilty plea, the trial court explained the range of punishment; verified that Ellison was not pleading guilty due to fear, threats, undue persuasion, or promises; admonished him that he would be required to register as a sex offender and ensured that he understood the ramifications thereof; and reminded Ellison of his right to a jury trial on guilt. The trial court confirmed that Ellison was competent; that he was satisfied with counsel's representation; and that he was freely, voluntarily, knowingly, and intelligently pleading guilty only because he was "in fact, guilty of the offense." *See* Tex. Code Crim. Proc. Ann. art. 26.13. Only after Ellison confirmed that he understood and agreed to all of the above did the trial court accept his guilty plea. The trial court substantially fulfilled its duty to admonish Ellison, which creates a prima facie case that his plea was knowing and voluntary. *Martinez v. State*, 981 S.W.2d 195, 197 (Tex. Crim. App. 1998). It was then Ellison's burden to demonstrate otherwise. *Id.*

14

state action may be "dissipated by the presence and advice of counsel." *Id.* at 754, 90 S. Ct. at 1472. And *Brady* does not address ineffective assistance; it assumes a defendant who is already "competently counseled" and "correctly advised with respect to the then existing law as to the possible penalties." *Id.* at 757, 90 S. Ct. at 1473. *Brady* stands for the proposition that when he is correctly counseled, the defendant cannot later complain that his plea was involuntary when subsequent developments in the law change the applicable range of punishment. *Id.*, 90 S. Ct. at 1473. Ellison has not identified any change in the law of punishment, and *Brady* holds that even if he had, he could not complain. Thus, *Brady* is wholly inapposite.

Nonetheless, Ellison's argument might more generally be understood as a complaint that trial counsel's prediction of Ellison's chances was not consistent with the state of the evidence. Thus, in what we understand as his third theory of ineffectiveness, Ellison reasons that counsel was inadequate in advising him to plead guilty because there was evidence suggesting that he was innocent. For example, at the hearing on the motion for new trial, Ellison's employer testified that he heard Diane say that she believed Ellison was innocent, and multiple witnesses attested that Diane often brought the children to see Ellison at work while the charges were pending. A friend of Ellison's named Jimmy Hill related that he had frequently seen Ellison playing with the children at the trailer park, but he had never witnessed Ellison do anything to hurt the children. Similarly, Ellison's mother Sandra swore that he was a good father who loved his children dearly and that he would never do anything to hurt them. As

15

for Ellison himself, he professed his innocence and testified that Diane had attempted to drop the charges, but the State would not comply. In view of this evidence, Ellison argues that trial counsel was ineffective for urging him to plead guilty.

However, trial counsel was not asked to testify at the hearing on the motion for new trial. Again, trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective, but counsel was never given the chance to explain his strategic thinking. *Menefield*, 363 S.W.3d at 593. In the absence of such an explanation, an appellate court commonly will assume a strategic motivation if any can possibly be imagined. *Ex parte Miller*, 330 S.W.3d 610, 616 n.9 (Tex. Crim. App. 2009). We can imagine at least one valid strategic motivation for this advice: in light of the seriousness of the offense and the compelling evidence that Ellison was guilty of it, counsel could have reasonably determined that Ellison's best option was to seek leniency by throwing himself upon the mercy of the jury. *See Ex parte Scott*, 541 S.W.3d 104, 122 (Tex. Crim. App. 2017) (recognizing that "accepting responsibility for his behavior and pleading for mercy from the jury" was a valid defensive strategy). The fact that this strategy ultimately proved unsuccessful does not render counsel ineffective. *Garza v. State*, 261 S.W.3d 361, 367 (Tex. App.—Austin 2008, pet. ref'd). "That appellant was ultimately assessed the maximum punishment means only that the risk did not pay off," not that counsel's representation was constitutionally "unacceptable." *Delrio v. State*, 840 S.W.2d 443, 447 (Tex. Crim. App. 1992). Thus, based on this undeveloped record, Ellison has not shown that counsel's prediction and

16

advice were so outrageous that no competent attorney would have issued them, *see Nava*, 415 S.W.3d at 308, especially given the inherent difficulty in predicting how a jury will assess punishment. *See Ex parte Rich*, 194 S.W.3d 508, 514 n.12 (Tex. Crim. App. 2006) ("[I]t is impossible to predict with any certainty what sentence he would have received . . . ."); *Hanson v. State*, No. 11-09-00278-CR, 2011 WL 704639, at *4 (Tex. App.—Eastland Jan. 13, 2011, pet. ref'd) (mem. op., not designated for publication) ("Predicting a sentencing decision is an inexact science at best."); *cf. Ex parte Chandler*, 182 S.W.3d 350, 359 (Tex. Crim. App. 2005) (noting, in the *Strickland* context, that "a bar card does not come with a crystal ball").

Viewing the evidence in the light most favorable to the trial court's ruling, we conclude that Ellison has failed to satisfy the first prong of *Strickland*. *See Burch*, 541 S.W.3d at 820. It is therefore unnecessary to examine the second prong. *See Lopez v. State*, 343 S.W.3d 137, 144 (Tex. Crim. App. 2011). We overrule Ellison's second issue.

## IV. JURY ARGUMENT

In his third issue, Ellison complains that the State made improper closing arguments. He maintains that the State inserted inflammatory personal appeals and matters outside the record when the State argued as follows: "With your verdict, you're protecting your own children, your own families, you're protecting my kids and all of the kids who none of . . . us have even met that live here in Hood County." Similarly, moments later, the State urged the jury to issue a stiff punishment in order "to tell me

17

and each other that this is never going to happen to my kids or your kids by this defendant."

However, Ellison did not object at any point during the State's closing argument. When a defendant fails to timely object, he will forfeit a complaint concerning improper jury argument. *Hernandez v. State*, 538 S.W.3d 619, 622 (Tex. Crim. App. 2018); *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996); *see* Tex. R. App. P. 33.1(a)(1). Ellison has therefore not preserved this claim for our review.

We overrule Ellison's third and final issue.

## V. CONCLUSION

Having overruled Ellison's three issues, we affirm the judgment of the trial court.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: August 22, 2019