# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00482-CR

---

**Elias Villarreal, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 274TH DISTRICT COURT OF HAYS COUNTY**
**NO. CR-22-0932-C, THE HONORABLE GARY L. STEEL, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A jury found appellant Elias Villarreal guilty of aggravated assault of a public servant and resisting arrest with a deadly weapon. *See* Tex. Penal Code §§ 22.02(a)(2), (b)(2)(B), 38.03(a), (d). The trial court assessed his punishment, enhanced to habitual-offender status, at thirty-five years' confinement for each offense and ordered that the sentences run concurrently. *See id.* §§ 3.03(a), 12.42(d). In seven issues, Villarreal contends that the evidence was legally insufficient to support the jury's guilty findings, that the guilt-innocence jury charge contained error, and that the trial court abused its discretion by redacting body-camera video to exclude his statements. We affirm the trial court's judgments of conviction.

# BACKGROUND

Shortly after midnight on February 20, 2022, Kyle Police Department (KPD) Officers William Orr and Daryl Seagrave responded to a call about a "verbal disturbance" between a woman and a man—later identified as Villarreal.[1]

Both officers testified at trial about their encounter with Villarreal, which Officer Orr testified lasted around twenty seconds. As the officers, wearing uniforms and driving marked patrol cars, turned onto a road in Kyle, Texas, they saw a woman walking down it away from them. Villarreal—carrying the metal handle for a floor jack, which the officers described as a "big stick"; "big metal pipe"; and "long, heavy object"—jumped over a gate adjoining the road and ran to Officer Seagrave's patrol car, which was in front of Officer Orr's. Villarreal struck Officer Seagrave's car repeatedly with the jack handle.

Officer Seagrave exited his car without putting it in park; deployed his Taser; and, while retreating, ordered Villarreal to drop the jack handle. Per KPD policy, Officer Orr drew his pistol to cover Officer Seagrave. Officer Seagrave testified that Villarreal struck the edge of the driver's door "right after" Officer Seagrave exited the car. He also testified that Villarreal had been "aggressively approaching" him. Officer Orr testified that Villarreal held the jack handle over his shoulder "like a baseball bat" and "like he was going to swing it poised and ready." He ignored both officers' commands to drop the handle.

Officer Seagrave discharged his Taser. He testified that although he believed it had connected, there had been "no effect" because Villarreal was "still swinging the pipe and approaching." Officer Orr testified that Villarreal then took two-to-four steps toward him while

---

[1] The woman was identified in the evidence admitted at trial, but her identity is not relevant to Villarreal's issues on appeal.

holding the jack handle in "the bat shoulder position." Villarreal did not swing the handle at either officer.

Next, Villarreal turned and began walking away from the officers in the direction the woman had gone and toward Officer Seagrave's car, which had continued to move slowly forward. The driver's door was open, and the passenger compartment contained an AR-15 rifle and a shotgun. The officers testified that they feared for their own safety as well as the safety of the community and the woman. Officer Orr testified that he believed that Villarreal had already committed criminal mischief by striking Officer Seagrave's car and that the officers had decided to arrest him.

As Villarreal was walking away from the officers, Officer Seagrave ran at and tackled him. Officer Orr testified that before Officer Seagrave contacted Villarreal, he "turned and swung towards" Officer Seagrave "like you would swing a baseball bat." Officer Orr also testified that Officer Seagrave closed the distance too quickly for Villarreal to "complete a full swing," that Villarreal hit Officer Seagrave on the left forearm, and that the strike did not appear accidental. Officer Orr admitted that "immediately after the incident there was some confusion as to whether it was an intentional turn [and] swing," that he had "expressed some uncertainty about whether it was an intentional swing" or whether Villarreal "was just turning with the pipe," and that "things that were said and expressed nearer to the time of the offense . . . tend to be more accurate." However, at trial he explained that his adrenaline had been flowing, that he had been emotional, that he engaged in "a lot of armchair quarterbacking" after the incident, and that he now believed "the swing wasn't accidental."

Officer Seagrave's testimony regarding his contact with the jack handle was similar to Officer Orr's testimony. Villarreal turned, swung, and caught Officer Seagrave on the

3

arm with the handle. Villarreal had assumed a "swing stance" and swung at Officer Seagrave before he made contact with Villarreal. Officer Seagrave had raised his arm to block the swing and had "a red mark" on it "about the size of a quarter." The injury was "minimal," but he experienced "a shooting pain down to [his] fingers," and "it hurt." Officer Seagrave testified that he did not consider it to be possible that Villarreal had merely turned and caught him by accident. He further testified that Villarreal's swinging the jack handle at him had prevented him from being able to arrest Villarreal.

Officers Orr and Seagrave both testified that the jack handle, as used by Villarreal, was a deadly weapon. Officer Orr testified that if Officer Seagrave had been "one step slower, the pipe would have hit him in the head."

After being tackled by Officer Seagrave, Villarreal was handcuffed, arrested, and eventually taken to a hospital. The defense's only witness, KPD Commander James Jones, testified that officers had taken Villarreal to the hospital because of his behavior. He also testified that a jack handle "could incapacitate somebody if they're hit in the right way," that "anything being swung like that would be classified as a deadly weapon," and that serious bodily injury could include a broken bone. Commander Jones further testified that he had held the jack handle and been told how it was used and that based on his training and experience, he believed it to be a deadly weapon.

During the guilt-innocence phase, the trial court admitted a portion of Officer Orr's and Officer Seagrave's body-cam videos, a portion of Officer Seagrave's dash-cam video, the jack handle, and a probable-cause affidavit sworn by Officer Seagrave. The videos were played for the jury until Villarreal was handcuffed. Although labeled "redacted" in the record

4

before us, the published portions of the videos seemingly contained no redacted statements. Rather, they ended before any statements concerning Villarreal's mental state were made.

In the full videos, which were admitted before trial for record purposes, Villarreal—after being handcuffed—began to yell repeatedly that he wanted to die and had wanted the officers to kill him. At one point, he asked the officers, "What do you think I did that for? You know, I want you to kill me. I want to die." The full videos also included multiple statements from Officer Seagrave confirming that Villarreal struck him with the jack handle as well as inculpatory, non-Mirandized statements from Villarreal. And Officer Orr's full body-cam video contained his statement to Officer Seagrave at the hospital: "[Villarreal] was turning, and you tackled him as he was coming around. I don't even think he was trying to swing. I think he was just bringing it out."

In his probable-cause affidavit, sworn on the same day that Villarreal was arrested, Officer Seagrave attested that Villarreal had been swinging "a large metal pipe" and that Officer Seagrave had deployed his Taser unsuccessfully after he observed Villarreal "raise the pipe at him and fear[ed] he might be struck with the pipe." Officer Seagrave also attested that as he approached Villarreal from behind, Villarreal "turned and struck" Officer Seagrave on his left arm with the jack handle, "causing him pain and redness which has yet to subside."

The jury found Villarreal guilty of aggravated assault of a public servant and resisting arrest with a deadly weapon. Following a punishment hearing, the trial court found all six enhancement allegations to be true and sentenced Villarreal to thirty-five years' confinement for each count. This appeal followed.

**DISCUSSION**

## I.      Sufficiency of the Evidence

Four of Villarreal's seven issues concern the sufficiency of the evidence supporting the jury's guilty findings. In his first two issues, each challenging one of his two convictions, he contends that the evidence was insufficient to prove beyond a reasonable doubt that Officer Seagrave's injury resulted from a voluntary act by Villarreal. In his first issue, he also contends that the evidence was insufficient to support his conviction for aggravated assault because a rational juror could not have found beyond a reasonable doubt that Villarreal intended to cause bodily injury to Officer Seagrave. In Villarreal's sixth and seventh issues—again challenging his respective convictions—he contends that the evidence was insufficient to prove beyond a reasonable doubt that he used the jack handle as a deadly weapon.

### A.      Standard of Review

When reviewing the sufficiency of the evidence, we view all the evidence in the light most favorable to the judgment to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020). In making this determination, we "consider all of the admitted evidence, regardless of whether it was properly admitted." *Stahmann*, 602 S.W.3d at 577. The factfinder "is the sole judge of credibility and weight to be attached to the testimony of the witnesses." *Id.* The factfinder "can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial," *id.*, and is "free to apply common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences from the evidence," *Eustis*

6

*v. State*, 191 S.W.3d 879, 884 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). "When the record supports conflicting inferences, we presume that the" factfinder "resolved the conflicts in favor of the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012).

We must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must also bear in mind that "direct and circumstantial evidence are treated equally" and that "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "can be sufficient" on its own "to establish guilt." *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). "The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence." *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) (quoting *Murray v. State*, 457 S.W.3d 446, 448–49 (Tex. Crim. App. 2015)). The evidence is legally insufficient if "the record contains no evidence, or merely a 'modicum' of evidence, probative of an element of the offense" or if "the evidence conclusively establishes a reasonable doubt." *Kiffe*, 361 S.W.3d at 107 (quoting *Jackson*, 443 U.S. at 320). We "cannot act as a thirteenth juror" and make our own assessment of the evidence; rather, our "role on appeal is restricted to guarding against the rare occurrence when the factfinder does not act rationally." *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018).

### B.     Voluntary Act

Subsection 6.01(a) of the Texas Penal Code requires that a person voluntarily engage in conduct as an element of guilt—an element distinct from the mens rea requirement. *See* Tex. Penal Code § 6.01(a); *Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014). Under the statute, the actor's conduct must only *include* a voluntary act, and it is sufficient that the voluntary act comprises but a portion of the offense's commission, even if that act is not the ultimate act. *Farmer v. State*, 411 S.W.3d 901, 906 (Tex. Crim. App. 2013); *Rogers v. State*, 105 S.W.3d 630, 638 (Tex. Crim. App. 2003). For example, a defendant who did not voluntarily pull a gun's trigger may be criminally responsible if he voluntarily drew the gun, pointed it, or cocked its hammer. *See Rogers*, 105 S.W.3d at 638.

"Voluntariness is a low threshold," and "[e]ven accidental or unintentional movements and actions are voluntary." *Rodriguez v. State*, 629 S.W.3d 229, 234 (Tex. Crim. App. 2021); *see Rogers*, 105 S.W.3d at 638–39 (interpreting "voluntary" versus "nonvolitional" under section 6.01). Under subsection 6.01(a), "voluntariness" refers to "one's own physical body movements," *Rogers*, 105 S.W.3d at 638, which are involuntary only if directly caused by an "outside force" or "truly nonvolitional action such as a muscle spasm," *Rodriguez*, 629 S.W.3d at 234; *see Rogers*, 105 S.W.3d at 638 (involuntary acts include those that "are the nonvolitional result of someone else's act, are set in motion by some independent non-human force, are caused by a physical reflex or convulsion, or are the product of unconsciousness, hypnosis or other nonvolitional impetus").

"The State need only prove voluntariness when the evidence raises an issue about it." *Gonzalez v. State*, 616 S.W.3d 585, 594 (Tex. Crim. App. 2020). In determining whether

the evidence was sufficient to prove voluntary conduct, "we apply the *Jackson* standard and look at the evidence and inferences from it in the light most favorable to the verdict." *Id.*

There was ample evidence in the record that Villarreal voluntarily swung the jack handle at Officer Seagrave before the officer made contact with him. Officer Orr testified that as Officer Seagrave was running at Villarreal, Villarreal "turned and swung into him" like he was "swinging a baseball bat." Officer Orr also testified that Villarreal had "turned to meet Officer Seagrave," that the contact occurred before Officer Seagrave tackled Villarreal, and that Villarreal was tackled only "once he had assaulted Officer Seagrave." And Officer Orr testified that based on Villarreal's stance and swing, the contact did not appear accidental. Although Officer Orr testified that immediately after Villarreal's arrest, he had doubted whether the contact was intentional, he clarified that after calming down, he had "a better understanding of what occurred that night"; that he no longer believed Villarreal's actions were accidental; that he believed Villarreal had been swinging; and that his testimony was truthful.

Officer Seagrave testified that as he had rushed Villarreal, Villarreal had turned, swung, and caught him on the arm. He further testified that Villarreal "was able to turn pretty quick and he's got a bat and he's swinging towards me," that Villarreal was in "the same swing stance" as before, and that Officer Seagrave had tried to block the swing by bringing up his arm. When asked whether it was possible that he had surprised Villarreal, who had "turned and didn't swing but caught [him] by accident," Officer Seagrave testified that he did not "see that as a possibility."

Officer Orr's and Officer Seagrave's body-cam videos, from which the following still-frames were respectively taken, likewise support the inference that Villarreal voluntarily swung the jack handle. Although neither video clearly shows the moment of contact, a rational

9

juror could have concluded that Villarreal had turned and prepared to swing while Officer Seagrave was still several feet away:





10

Viewing the evidence under the applicable standard of review, we conclude that a rational juror could have found beyond a reasonable doubt that Villarreal voluntarily swung the jack handle at Officer Seagrave. *See Jackson*, 443 U.S. at 319; *Stahmann*, 602 S.W.3d at 577.

Moreover, Villarreal does not dispute that he voluntarily wielded the handle and carried it like a baseball bat. Thus, even if a rational juror could find only that Villarreal had reflexively and involuntarily turned at Officer Seagrave's approach, because Villarreal's conduct included voluntary acts performed during his commission of the offense, the juror could still have found beyond a reasonable doubt that Villarreal had acted voluntarily under subsection 6.01(a) and was therefore criminally responsible. *See Farmer*, 411 S.W.3d at 906; *Rogers*, 105 S.W.3d at 638; *see also Rodriguez*, 629 S.W.3d at 234 (concluding, where defendant testified that he "gripped" gun "tightly" as part of "instinctual reaction" to having people grab at him and gun, that "rational jury could find that by gripping the gun tightly with his finger on the trigger," defendant "fired the gun voluntarily").

### C. Intent

As charged in the indictment in this case, a person commits aggravated assault of a public servant with a deadly weapon where the actor intentionally, knowingly, or recklessly causes bodily injury to a public servant and uses or exhibits a deadly weapon during the assault. *See* Tex. Penal Code §§ 21.01(a)(1), 22.02(a)(2), (b)(2)(B); *Gonzalez v. State*, 610 S.W.3d 22, 24 (Tex. Crim. App. 2020). "[A]n assaultive offense causing bodily injury is a result-oriented offense," *Garfias v. State*, 424 S.W.3d 54, 60 (Tex. Crim. App. 2014), and the gravamen of this type of aggravated assault—or the criminal act requiring a culpable mental state—is the act of "causing bodily injury," *Rodriguez v. State*, 538 S.W.3d 623, 629 (Tex. Crim. App. 2018). Thus,

the State was required to prove beyond a reasonable doubt that Villarreal intentionally, knowingly, or recklessly caused bodily injury to Officer Seagrave by striking him with the jack handle.[2]

A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result. *See* Tex. Penal Code § 6.03(a). "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b). And a person acts recklessly, or is reckless, with respect to the result of his conduct when "he is aware of but consciously disregards a substantial and unjustifiable risk that" the result will occur. *Id.* § 6.03(c). "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.*

"'Bodily injury'" is defined as "physical pain, illness, or any impairment of physical condition," *id.* § 1.07(a)(8), and a factfinder "may infer that a victim actually felt or suffered physical pain because people of common intelligence understand pain and some natural causes of it," *Wingfield v. State*, 282 S.W.3d 102, 105 (Tex. App.—Fort Worth 2009, pet. ref'd). Although "no witness—including the victim—need testify that the victim felt pain," *Coleman v. State*, 631 S.W.3d 744, 751 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd), "[d]irect evidence that a victim suffered pain is sufficient to show bodily injury," *Laster v. State*, 275 S.W.3d 512, 524 (Tex. Crim. App. 2009). "Any physical pain, however minor, will suffice to establish bodily injury." *Garcia v. State*, 367 S.W.3d 683, 688 (Tex. Crim. App. 2012). The

---

[2]   The indictment refers to the jack handle as a "pipe," and the terms were used interchangeably during the trial.

12

definition "encompasses even relatively minor physical contact if it constitutes more than offensive touching." *Laster*, 275 S.W.3d at 524.

Proof of mental state "will almost always depend upon circumstantial evidence." *Duntsch v. State*, 568 S.W.3d 193, 216 (Tex. App.—Dallas 2018, pet. ref'd). A jury "may infer that a defendant intends the natural consequences of his acts" and may infer his knowledge or intent "from any facts tending to prove its existence, including the method of committing the crime, the nature of wounds inflicted on the victims, and the accused's acts, words, and conduct." *Owens v. State*, 549 S.W.3d 735, 741 (Tex. App.—Austin 2017, pet. ref'd) (citing *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002)).

Villarreal incorrectly argues that the State was required to prove that he acted intentionally. Because the statute criminalizing aggravated assault lists three culpable mental states—intent, knowledge, and recklessness—disjunctively, "proof of any one of the three is sufficient to support a conviction." *Perez v. State*, 704 S.W.2d 499, 501 (Tex. App.—Corpus Christi–Edinburg 1986, no pet.); *see Dorch v. State*, 596 S.W.3d 871, 878 (Tex. App.—San Antonio 2019, pet. ref'd) ("[B]ecause the statute lists the culpable mental states in the disjunctive, the State was required to prove only 'intentional' or 'knowing' to satisfy the mens rea element of the offense."); *Stobaugh v. State*, 421 S.W.3d 787, 861 (Tex. App.—Fort Worth 2014, pet. ref'd) ("[J]urors are not required to agree on the defendant's specific mental state; rather, they need only agree that the defendant possessed one of the alternate mental states that satisfy the element of intent under the statute.").

The evidence discussed above regarding the voluntariness of Villarreal's swing of the jack handle also served to prove his mental state. The fact that Villarreal voluntarily swung a large metal jack handle into Officer Seagrave—causing the officer to suffer "shooting pain" and

13

a red welt—was itself sufficient evidence for the jury to reasonably infer that he intended to cause the injury that occurred. *See Laster*, 275 S.W.3d at 524 ("Because '[o]ne's acts are generally reliable circumstantial evidence of one's intent,' the jury could reasonably infer that Laster intended to do exactly what he did—to inflict bodily injury on B.T." (quoting *Rodriguez v. State*, 646 S.W.2d 524, 527 (Tex. App.—Houston [1st Dist.] 1982, no pet.))).

In addition, before swinging the jack handle at Officer Seagrave, Villarreal had used it to batter the officer's patrol car, had hit the driver's door "right after" Officer Seagrave exited, and had "aggressively" approached him with the handle raised in the air "like a bat" and "like he was going to swing it poised and ready." Villarreal had ignored both officers' commands to drop the handle. The jury could view Villarreal's threatening use of the handle as evidence of his intent to cause bodily injury. *See Ortiz v. State*, 993 S.W.2d 892, 894 (Tex. App.—Fort Worth 1999, no pet.) ("[A]n attacker's assertive conduct with a weapon during an attack may be evidence of his intent to use the weapon to inflict serious bodily injury or death.").

Villarreal emphasizes that he never verbally threatened the officers and eventually turned and walked away from them and that Officer Orr was initially unsure whether Villarreal had intentionally swung the jack handle. However, we must view the evidence in the light most favorable to the judgments and presume that the jury resolved all conflicts and contradictions in the evidence in favor of its verdicts. *Stahmann*, 602 S.W.3d at 577; *Merritt*, 368 S.W.3d at 525–26.

We conclude that on this record, a rational juror could have found beyond a reasonable doubt that Villarreal had intended to cause bodily injury when he swung the jack handle toward Officer Seagrave. *Jackson*, 443 U.S. at 319; *Stahmann*, 602 S.W.3d at 577.

#### D. Deadly Weapon

A deadly weapon includes "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code § 1.07(a)(17)(B). "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46).

As noted above, the indictment in this case alleged that Villarreal committed aggravated assault of a public servant by using or exhibiting a deadly weapon. *See id.* § 22.02(a)(2). And as charged in the indictment, a person commits the offense of resisting arrest with a deadly weapon "if the actor uses a deadly weapon to resist the arrest or search." *Id.* § 38.03(d). In his sixth and seventh issues, respectively, Villarreal contends that the evidence was insufficient to prove that he used or exhibited a deadly weapon during his assault of Officer Seagrave or used a deadly weapon to resist arrest. Villarreal asserts that "the only question" is whether the handle qualified as a deadly weapon in the manner in which he used it.

To determine whether a weapon is deadly in its manner of use or intended use, "we consider words and other threatening actions by the defendant, including the defendant's proximity to the victim; the weapon's ability to inflict serious bodily injury or death, including the size, shape, and sharpness of the weapon; and the manner in which the defendant used the weapon." *Johnson v. State*, 509 S.W.3d 320, 323 (Tex. Crim. App. 2017) (internal citations omitted). In addition, we may also consider "testimony by the victim that she feared death or serious bodily injury," *Hopper v. State*, 483 S.W.3d 235, 239 (Tex. App.—Fort Worth 2016, pet. ref'd) (citing *Brown v. State*, 716 S.W.2d 939, 946 (Tex. Crim. App. 1986)), as well as the "presence and severity of wounds," though wounds "are not a prerequisite to a finding of

deadliness," *Hammons v. State*, 856 S.W.2d 797, 800–01 (Tex. App.—Fort Worth 1993, pet. ref'd) (citing *Denham v. State*, 574 S.W.2d 129, 130 (Tex. Crim. App. 1978)). "No one factor is determinative, and each case must be examined on its own facts." *Adame v. State*, 69 S.W.3d 581, 584 (Tex. Crim. App. 2002); *see Johnson*, 509 S.W.3d at 323 ("These, however, are just factors used to guide a court's sufficiency analysis; they are not inexorable commands.").

Moreover, a deadly-weapon finding does not require that the appellant has "actually inflicted harm on the victim," *Johnson*, 509 S.W.3d at 323, or even *intended* death or serious bodily injury, *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000). "[O]bjects used to threaten deadly force are in fact deadly weapons[,] . . . even if the actor has no intention of actually using deadly force." *Id.* The weapon need only be "capable of causing death or serious bodily injury" or be "displayed in a manner conveying an express or implied threat that serious bodily injury or death will result if the aggressor is not satisfied." *Hammons*, 856 S.W.2d at 801 (citing *Jackson v. State*, 668 S.W.2d 723, 725 (Tex. App.—Houston [14th Dist.] 1983, pet. ref'd)).

As discussed above, a rational juror could have found beyond a reasonable doubt that Villarreal had acted voluntarily in swinging the jack handle toward Officer Seagrave with the intent to cause bodily injury. Officer Orr testified that had Officer Seagrave been a step slower, the pipe might have struck him in the head. It was undisputed that Villarreal aggressively approached Officer Seagrave with the handle raised like a bat about to be swung and caused the officer to retreat. *See McCain*, 22 S.W.3d at 503; *Hammons*, 856 S.W.2d at 801. Officer Orr testified that he had feared for Officer Seagrave's life. *See Hopper*, 483 S.W.3d at 239. Significantly, at no point did the defense provide an explanation for Villarreal's possession of the handle other than to threaten, menace, or assault the officers. Although Villarreal argues

16

that he had wanted to commit suicide-by-cop, such a motivation still necessitates using the jack handle in a manner sufficiently threatening to provoke a lethal response by officers. *See Flores v. State*, 620 S.W.3d 154, 159 (Tex. Crim. App. 2021) ("[C]ritical to a proper deadly-weapon analysis are the facts of the case showing the defendant's particular manner of use or intended use of the object—his reason for having the object with him.").

The officers described the handle as a "long, heavy object" and a "big metal pipe" that left indentations in the patrol car and was "obviously heavy enough to do damage to the vehicle without . . . being damaged itself." Both officers testified that they believed that the handle, as used by Villarreal, was a deadly weapon. Commander Jones likewise testified that an object like the handle "could incapacitate somebody if they're hit in the right way"; that "anything being swung like that would be classified a deadly weapon"; and that, having been told how the handle was used, he too believed it to have been a deadly weapon. He testified that serious bodily injury can include a broken bone. The handle was admitted into evidence at trial. *See Robertson v. State*, 163 S.W.3d 730, 734 (Tex. Crim. App. 2005) (noting that admission of object allows jurors to observe its characteristics); *Wilson v. State*, 391 S.W.3d 131, 137 (Tex. App.—Texarkana 2012, no pet.) (stressing that admitted sledgehammer was "not something that was abstract in the eyes of the jury; it was present in the courtroom for the jury to view and evaluate as to whether it could be classified as a deadly weapon").

Officer Orr testified that at the time that Villarreal struck Officer Seagrave with the handle, Villarreal had committed criminal mischief by damaging the car, and the officers had already decided to arrest him. Further, Officer Seagrave testified that Villarreal's swinging the handle prevented him from being able to arrest Villarreal.

Viewing these facts under the applicable standard of review, we conclude that a rational juror could have found beyond a reasonable doubt that Villarreal used or exhibited a deadly weapon during his assault of Officer Seagrave and used a deadly weapon to resist arrest. We overrule Villarreal's first, second, sixth, and seventh issues.

## II.  Jury-Charge Error

Villarreal's third and fourth issues concern alleged error in the guilt-innocence jury charge.  In his third issue, he contends that the application paragraph for resisting arrest omitted an element of the offense.  In his fourth issue, he contends that he was egregiously harmed by the inclusion of an unnecessary voluntary-intoxication instruction.

### A.  Standard of Review

A trial court is statutorily obligated to instruct the jury on the "law applicable to the case."  *See* Tex. Code Crim. Proc. art. 36.14; *Mendez v. State*, 545 S.W.3d 548, 552 (Tex. Crim. App. 2018).  The jury charge should tell the jury what law applies and how it applies to the case.  *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007).  The trial court's duty to instruct the jury on the "law applicable to the case" exists even when defense counsel fails to object to inclusions or exclusions in the charge.  *Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013).  The trial court is "'ultimately responsible for the accuracy of the jury charge and accompanying instructions.'"  *Mendez*, 545 S.W.3d at 552 (quoting *Delgado*, 235 S.W.3d at 249).

We review alleged jury-charge error in two steps:  first, we determine whether error exists; if so, we then evaluate whether sufficient harm resulted from the error to require reversal.  *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022).  When, as here, the

18

defendant does not make a timely objection during the proceedings below, we must determine whether the record establishes that the error caused him "egregious harm." *See Gonzalez*, 610 S.W.3d at 27. "Neither party bears a burden of production or persuasion with respect to [the] harm analysis, the question being simply what the record demonstrates." *Hollander v. State*, 414 S.W.3d 746, 749–50 (Tex. Crim. App. 2013).

Errors that result in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defensive theory. *Gonzalez*, 610 S.W.3d at 27; *see Chambers v. State*, 580 S.W.3d 149, 154 (Tex. Crim. App. 2019) (stating that egregious harm occurs when error "created such harm that the appellant was deprived of a fair and impartial trial"). The appellant must have suffered actual, and not merely theoretical, harm. *Gonzalez*, 610 S.W.3d at 27. In determining whether egregious harm exists, we must evaluate the entire record in light of four factors: 1) the complete jury charge; 2) the arguments of counsel; 3) the entirety of the evidence, including the contested issues and weight of the probative evidence; and 4) any other relevant factors revealed by the record as a whole. *Id.*; *Hollander*, 414 S.W.3d at 749–50 (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)).

### B. "By Using Force"

A jury charge must set out all the essential elements of a charged offense. *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012). The charge contains two parts: an abstract paragraph and an application paragraph. Abstract paragraphs "serve as a glossary to help the jury understand the meaning of concepts and terms used in the application paragraphs of the charge." *Crenshaw v. State*, 378 S.W.3d 460, 466 (Tex. Crim. App. 2012). Application

paragraphs, on the other hand, are the "heart and soul" of the charge and apply "the pertinent penal law, abstract definitions, and general legal principles to the particular facts and the indictment allegations" of the case. *Vasquez*, 389 S.W.3d at 366–67.

The complete statutory elements of the offense of resisting arrest are that a person:

(1) "intentionally prevents or obstructs"

(2) "a person he knows is a peace officer or a person acting in a peace officer's presence and at his direction"

(3) "from effecting an arrest, search, or transportation of the actor or another"

(4) "by using force against the peace officer or another."

*Dobbs v. State*, 434 S.W.3d 166, 170–71 (Tex. Crim. App. 2014) (quoting Tex. Penal Code § 38.03(a)). "The offense is elevated from a Class A misdemeanor to a third-degree felony if 'the actor uses a deadly weapon to resist the arrest or search.'" *Id.* (quoting Tex. Penal Code § 38.03(d)).

Villarreal contends that the guilt-innocence charge in this case was erroneous because the element "by using force against the peace officer or another"—like the other elements of the offense—were recited in the abstract paragraph and not in the application paragraph. He also appears to fault the application paragraph for tracking "the indictment, not the statute."

He is incorrect about the element's absence and the propriety of the charge's wording. It is precisely the application paragraph's function to apply the statutory elements to the particular facts of the case as indicted. *See Vasquez*, 389 S.W.3d at 366–67. The application paragraph here instructed the jury in relevant part to convict Villarreal only if it found beyond a

20

reasonable doubt that he "intentionally prevented Officer Seagrave and/or Officer Orr, a person the defendant knew to be a peace officer, from effecting the arrest of the defendant by swinging a pipe toward the officer, and the defendant did then and there use a deadly weapon, to-wit: a pipe." Because the application paragraph "instruct[ed] the jury with respect to every element of the offense" and "did not authorize a conviction on proof of less than all of the requisite elements of the offense," no fundamental error existed. *Hudson v. State*, 675 S.W.2d 507, 512 (Tex. Crim. App. 1984). Although the paragraph—which as Villarreal recognized tracked the indictment— specified "by swinging a pipe" instead of the statutory language "by using force," that specificity was not error.[3] *See* Tex. Code Crim. Proc. art. 21.17 ("Words used in a statute to define an offense need not be strictly pursued in the indictment; it is sufficient to use other words conveying the same meaning, or which include the sense of the statutory words."); *King v. State*, 675 S.W.2d 514, 516 (Tex. Crim. App. 1984) ("It is not necessary to use the exact words of the statute where the facts alleged are sufficient to constitute an allegation comprehensive of the statutory term.").

Accordingly, we overrule Villarreal's third issue.

C.      **Voluntary Intoxication**

The trial court instructed the jury that "[v]oluntary intoxication is not a defense to an offense." The instruction was given in the "General Principles" section of the charge, preceding the "Instructions of the Court" section, which included abstract and application

---

[3] In fact, the Court of Criminal Appeals has concluded that "the Legislature would have understood the phrase 'using force against the peace officer or another' as meaning" exactly what was required by the instruction in this case: "violence or physical aggression, or an immediate threat thereof, in the direction of and/or into contact with, or in opposition or hostility to, a peace officer or another." *Dobbs v. State*, 434 S.W.3d 166, 171 (Tex. Crim. App. 2014).

21

paragraphs tailored to each offense. In his fourth issue, Villarreal contends that the voluntary-intoxication instruction's inclusion was error because "there was no evidence to justify its inclusion into the charge." He argues that the instruction egregiously harmed him by lowering the State's burden of proof and that the harm was exacerbated by the exclusion of evidence that he was attempting "suicide-by-cop." The State responds that the instruction was not erroneous or, alternatively, that any error was not egregiously harmful.

Subsection 8.04(a) of the Texas Penal Code provides that "[v]oluntary intoxication does not constitute a defense to the commission of a crime." Tex. Penal Code § 8.04(a). A subsection 8.04(a) instruction "need not appear in every jury charge," and "there is no *sua sponte* duty to instruct the jury on that issue." *Sakil v. State*, 287 S.W.3d 23, 26 (Tex. Crim. App. 2009). However, such an instruction is appropriate even when the defendant does not rely on intoxication as a defense as long as "there is evidence from any source that might lead a jury to conclude that the defendant's intoxication somehow excused his actions." *Id.*; *see Taylor v. State*, 885 S.W.2d 154, 158 (Tex. Crim. App. 1994). Because a jury charge should "actively prevent confusion," the Court of Criminal Appeals has previously determined that inclusion of a subsection 8.04(a) instruction was not erroneous where the evidence "did not establish unequivocally that [a defendant] was intoxicated the day of the assault," *Sakil*, 287 S.W.3d at 27, and where "only 'slight' evidence suggested that a defendant's actions were precipitated by drug use," *id.* at 28 n.10 (citing *Taylor*, 885 S.W.2d at 158).

In the present case, there was sufficient evidence—albeit slight—from which a rational juror could have concluded that Villarreal's actions resulted from, and were somehow excused by, intoxication. Officer Orr testified that Villarreal's behavior was unpredictable from "the very onset," when he jumped a gate, ran directly to Officer Seagrave's patrol car—and

22

seemingly in the opposite direction of the woman with whom he had been fighting, and began striking the car with the jack handle. Villarreal ignored officers' commands and continued aggressively to approach Officer Seagrave after being hit by a Taser. He took several threatening steps toward each officer before turning toward the woman and Officer Seagrave's open, moving car. Once handcuffed, Villarreal thrashed, kicked, and pushed against the officers. Officer Orr testified that "[a]t one point he started thrashing around so badly it sounded like he was banging either his head or his body—something hard—against the inside of the prisoner compartment." Officer Orr also testified that officers eventually had to secure Villarreal in a restraint harness and helmet to prevent him from hurting himself.

Given this evidence, the trial court did not err by including the voluntary-intoxication instruction. *See Hernandez v. State*, No. 07-19-00070-CR, 2020 WL 3067694, at *2 (Tex. App.—Amarillo May 7, 2020, no pet.) (mem. op., not designated for publication) (voluntarily-intoxication instruction was warranted where officer remarked that defendant appeared to be "on drugs," defendant's behavior and strength were "unusual," and defendant's actions during his arrest were "combative").

Even if the instruction were erroneous, it did not egregiously harm Villarreal. There is nothing in the record to suggest that the jury relied on the instruction to Villarreal's detriment. We have previously deemed the inclusion of an unnecessary voluntary-intoxication instruction to be at worst superfluous. *See Zuliani v. State*, 52 S.W.3d 825, 831 (Tex. App.—Austin 2001), *rev'd on other grounds*, 97 S.W.3d 589, 593 (Tex. Crim. App. 2003). If the jury believed that Villarreal had not been intoxicated, it could simply ignore the instruction; if it believed he had been, the instruction correctly guided jurors to disregard the intoxication in assessing guilt. *See id.*

23

Additionally, where, as here, "the application paragraph correctly instructs the jury, an error in the abstract instruction is not egregious." *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999). The inclusion of a "merely superfluous abstraction" never produces reversible error in the court's charge "because it has no effect on the jury's ability fairly and accurately to implement the commands of the application paragraph or paragraphs." *Plata v. State*, 926 S.W.2d 300, 302–03 (Tex. Crim. App. 1996), *overruled on other grounds by Malik v. State*, 953 S.W.2d 234, 239–40 (Tex. Crim. App. 1997).

We overrule Villarreal's fourth issue.

## III. Exclusion of "Suicide-by-Cop" Evidence

In his fifth issue, Villarreal contends that the trial court abused its discretion by excluding evidence of statements he made after he was handcuffed. The statements, which were recorded on Officer Orr's and Officer Seagrave's body-cam videos, expressed Villarreal's desire to die and to be shot by police—a desire referred to by the trial court as "suicide by cop." Villarreal argues that the statements were admissible under the rule of optional completeness; as present sense impressions, excited utterances, and statements of his then-existing mental or emotional condition; or because the State opened the door by eliciting testimony that his behavior was unpredictable. *See* Tex. R. Evid. 107, 801(1)–(3).[4]

---

[4] Villarreal also argues that he was "unconstitutionally prevented from presenting the fundamental elements of his defense as a result because he could not present his defense without waiving his rights under the Fifth Amendment, which would have exposed his prior criminal history, and therefore, his right to due process was violated." To the extent that he intends to raise a freestanding constitutional violation distinct from his evidentiary issue, defense counsel did not make such an argument before the trial court, and the issue was therefore not preserved for appellate review. *See Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009) (alleged violation of constitutional right to present defense is forfeitable and is not preserved if not presented to trial court); Tex. R. App. P. 33.1(a).

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). An abuse of discretion does not occur unless the trial court acts "arbitrarily or unreasonably" or "without reference to any guiding rules and principles." *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016) (quoting *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). In other words, we may not reverse the trial court's ruling unless the "decision falls outside the zone of reasonable disagreement." *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Henley*, 493 S.W.3d at 93 (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)). We review the trial court's ruling by considering the record before the court "at the time the ruling was made." *Khoshayand v. State*, 179 S.W.3d 779, 784 (Tex. App.—Dallas 2005, no pet.).

During a pretrial hearing, the State objected to the admission of Villarreal's statements, arguing that they were irrelevant and "substantially more prejudicial than probative" and that they constituted inadmissible self-serving hearsay. *See* Tex. R. Evid. 403; *Davis v. State*, 970 S.W.2d 758, 761 (Tex. App.—Austin 1998, pet. ref'd) (recognizing "rule in Texas that self-serving declarations are not admissible in evidence as proof of the facts asserted" as well as exceptions to rule). Defense counsel responded that the statements were part of the offense's *res gestae* and were relevant to whether Villarreal had the requisite culpable mental state.

The trial court sustained the objection, excluded statements made by Villarreal after he was handcuffed, and announced that it intended to give a contemporaneous instruction to the jury that "based upon the rules of evidence, the Constitution, the Code of Criminal

25

Procedure, [it had] made certain rulings. So there are times that you will not hear any audio on this. That's the ruling of the Court." Neither party objected to the anticipated instruction.

During a subsequent hearing outside the jury's presence, defense counsel informed the trial court that—without going into Villarreal's statements—counsel intended to ask Officers Orr and Seagrave if they had "evidence or information" that Villarreal "was not in the right state of mind" and "about their impression of whether this was suicide by cop." The trial court ruled that it would not allow the questioning because it was not relevant "to the immediate response of the police officers in what was going on" based on what the court had seen on the video. The trial court instructed both officers outside the jury's presence that they could testify about Villarreal's behavior or "physical responses"—including yelling or screaming—but could not testify about his "specific words."

After reviewing the record, we will assume without deciding that the trial court abused its discretion by excluding evidence pertaining to Villarreal's statements that he wished to die and to be killed by police. However, we conclude that any error was harmless. *See Rodriguez-Flores v. State*, 351 S.W.3d 612, 635 (Tex. App.—Austin 2011, pet. ref'd).

## A.    Was the Error Constitutional?

We first address whether the complained-of error was constitutional error. The erroneous exclusion of evidence offered under the rules of evidence generally constitutes non-constitutional error and is reviewed under Rule 44.2(b). *Walters v. State*, 247 S.W.3d 204, 219 (Tex. Crim. App. 2007). There are two circumstances in which the improper exclusion of evidence may establish a constitutional violation:

26

> (1) when a state evidentiary rule categorically and arbitrarily prohibits the defendant from offering relevant evidence that is vital to his defense; or (2) when a trial court erroneously excludes relevant evidence that is a vital portion of the case and the exclusion effectively precludes the defendant from presenting a defense.

*Ray v. State*, 178 S.W.3d 833, 835 (Tex. Crim. App. 2005).

Villarreal did not argue below, and does not argue on appeal, that an evidentiary rule categorically prevented him from offering vital defensive evidence. Thus, for the trial court's ruling to be constitutional error, it must have effectively precluded him from presenting a meaningful defense.

Evidentiary rulings "rarely rise to the level of denying the fundamental constitutional rights to present a meaningful defense." *Potier v. State*, 68 S.W.3d 657, 663 (Tex. Crim. App. 2002). To amount to constitutional error under the second category, an erroneous ruling must go "to the heart of the defense," and the excluded evidence must form "such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense" at all. *Id.* at 665. The fact that a defendant was unable to present his case to the extent and in the form he desired is not prejudicial where he was not prevented from presenting the substance of his defense to the jury. *Id.* at 666.

Villarreal argues that the excluded evidence was necessary to show that he lacked the intent to assault Officer Seagrave. However, Villarreal was able to—and did—present his lack-of-intent defense at trial. Defense counsel elicited testimony from Officers Orr and Seagrave that Villarreal had not swung the jack handle while approaching them and questioned both officers about whether Villarreal had in fact voluntarily swung the handle at Officer Seagrave or had reacted reflexively. Counsel also questioned Officer Orr about

27

contemporaneous statements the officer had made that contradicted his testimony. In counsel's closing argument, he argued that Villarreal had intended to damage only the patrol car and had abandoned any attempt to assault the officers by walking away and that any contact with Officer Seagrave was accidental.

Because the complained-of exclusion in this case did not prevent Villarreal from presenting his lack-of-intent defense, the trial court's erroneous evidentiary ruling was not of constitutional magnitude. *See id.*

## B. Did the Error Harm Villarreal?

We must disregard non-constitutional error that does not affect an appellant's substantial rights. *See* Tex. R. App. P. 44.2(b) ("Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). Substantial rights are not affected by the erroneous exclusion of evidence if, after examining the record as a whole, we have a fair assurance that the error did not influence the jury, or had only a slight effect. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). In assessing the likelihood that the jury's decision was adversely affected by the error, we consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error, and how it might be considered in connection with other evidence in the case. *Id.* We may also consider the existence and degree of additional evidence indicating guilt, the trial court's instructions, whether the State emphasized the complained-of error, the State's theory and any defensive theories, closing argument, and voir dire, if applicable. *Cook v. State*, 665 S.W.3d 595, 599 (Tex. Crim. App. 2023); *Motilla*, 78 S.W.3d at 355–56.

28

The jury charge properly tailored the definitions of "intentionally," "knowingly," and "recklessly" to a result-of-conduct offense and instructed the jury that it could convict Villarreal of aggravated assault of a public servant only if it found beyond a reasonable doubt that he had "intentionally, knowingly or recklessly caused Officer Seagrave bodily injury by striking Officer Seagrave on or about the arm." The charge explained that the burden of proof was the State's alone and that Villarreal was presumed innocent. *See Luquis v. State*, 72 S.W.3d 355, 366 (Tex. Crim. App. 2002) ("We assume that the jury followed the instructions as given."). Moreover, when Officer Orr's and Officer Seagrave's body-cam videos were published to the jury, the trial court provided jurors with a contemporaneous instruction designed to prevent confusion about any missing audio. There is nothing in the record to suggest that the excluded evidence impacted the jury's deliberation.

It is unlikely that the excluded evidence would have had the effect Villarreal claims. Evidence that Villarreal wanted police to kill him does not logically preclude his having assaulted Officer Seagrave. Indeed, jurors may have inferred the opposite conclusion: because Villarreal was attempting suicide-by-cop, he was willing to escalate his conduct until officers used lethal force. And even if jurors would have understood the excluded evidence to be exculpatory, it is improbable that it would have created a reasonable doubt as to Villarreal's guilt in light of the remaining evidence. As discussed at length above, there was substantial evidence that when rushed by Officer Seagrave, Villarreal turned and voluntarily and intentionally swung the jack handle toward him. Although defense counsel argued that Villarreal had not wanted to harm the officers—as exemplified by the damage to the patrol car, the fact that Villarreal did not swing the jack handle while walking towards the officers, and his eventually turning away from them—that was not the case when he swung the handle.

29

The State emphasized the erroneous ruling by focusing during its closing argument on Villarreal's mindset and motive. The State's attorney rhetorically asked how jurors could "ever decide what was going on in someone else's head" before arguing that they should look to the circumstances surrounding Villarreal's conduct. The attorney also argued that there was "no other reason why you would pick up something like [the jack handle] unless you're going to use it as a weapon" and that Villarreal was "angry" and "upset" but "taking it out . . . on the cop car" was "not enough."

Yet the State's closing argument was offset to some extent by defense counsel's opening statement, in which he invited the jury to view Villarreal's behavior as pursuing suicide-by-cop. Counsel previewed the anticipated evidence for jurors:

> What you will see is a man in obvious distress who, when he is first confronted by the police, attacks the police car. I believe that the evidence will show you that he had intent for them to shoot him that night. He was disturbed mentally and he wanted to commit suicide by cop as it's colloquially known.

Later in his opening statement, counsel asked jurors whether the jack handle was being used as a deadly weapon or whether Villarreal was "using it to create a situation where he could end his life or someone could end it for him." Counsel explained, "That's what it's about. It's about intent and it's about the use of this object in a way that is crucial to the State's case."

Any potential harm was likewise mitigated during voir dire, in which defense counsel asked veniremembers for their views on how the mental health and justice systems "collide." Counsel cautioned panelists, "You may not learn as much as you want to about Mr. Villarreal or any person or the circumstances about what led to this. Some of that may be shielded from you." Elsewhere, counsel asked, "How do you respond to a mental health crisis that is happening," and continued:

30

And it's police officers responding and it's now that that is the reality of the situation. Do y'all agree with that?

We just don't have the resources in the world to act and to treat what's happening in mental health and I think that's true in Hays County. So I only bring that up because it may reveal itself to be something that's important and it may not, but I have to know your thoughts on that.

From our review of the record, we conclude that the exclusion of the evidence did not affect Villarreal's substantial rights or have a substantial and injurious effect or influence in determining the jury's verdict. *See* Tex. R. App. P. 44.2(b); *Cook*, 665 S.W.3d at 599. We overrule his fifth issue.

## CONCLUSION

Having overruled each of Villarreal's issues, we affirm the trial court's judgments of conviction.

_____

Maggie Ellis, Justice

Before Chief Justice Byrne, Justices Theofanis and Ellis
  Concurring Opinion by Justice Ellis

Affirmed

Filed: August 13, 2025

Do Not Publish